701 F.2d 1000
 Fed. Sec. L. Rep. P 99,115
SAN FRANCISCO REAL ESTATE INVESTORS, Plaintiff, Appellant,
v.
REAL ESTATE INVESTMENT TRUST OF AMERICA, et al., Defendants,
Appellees.
SAN FRANCISCO REAL ESTATE INVESTORS, Plaintiff, Appellee,
v.
REAL ESTATE INVESTMENT TRUST OF AMERICA, Defendant, Appellee.
Unicorp American Corporation, et al., Defendants, Appellants.
 Nos. 82-1853, 82-1865.
 United States Court of Appeals,
First Circuit.
 Argued Jan. 7, 1983.
Decided March 9, 1983.
 
 Douglas M. Kraus, Cleveland, Ohio, with whom Dennis J. Drebsky, Charles M. Yablon, Skadden, Arps, Slate, Meagher & Flom, New York City, Earle C. Cooley, Jeffrey B. Rudman, Kenneth R. Berman, Thomas N. O'Connor, and Hale & Dorr, Boston, Mass., were on brief, for San Francisco Real Estate Investors.
 Robert B. Mazur, New York City, with whom Louis J. Barash, Daniel N. Perlmutter, and Wachtell, Lipton, Rosen & Katz, New York City, were on brief, for Unicorp American Corp., et al.
 Jacob H. Stillman, Associate Gen. Counsel, and David A. Sirignano, Sp. Counsel, Washington, D.C., were on brief for S.E.C., amicus curiae.
 Don M. Kennedy, Boston, Mass., with whom James J. Dillon, James B. Farmer, Boston, Mass., Cerise H. Lim Epstein, Brookline, Mass., Frank D. Saylor, IV, Boston, Mass., Goodwin, Procter & Hoar, Boston, Mass. and Squire, Sanders & Dempsey, New York City, were on brief, for Real Estate Inv. Trust of America, et al.
 Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.
 COFFIN, Chief Judge.
 
 
 1
 This appeal concerns a struggle for control of one large company by another through a tender offer. Both the target company and the bidder are real estate investment trusts (REITs), organized pursuant to 26 U.S.C. Sec. 856 and subject to certain constraints[1] and possessing the advantage of avoiding a separate income tax on the corporate entity, a single tax being paid by shareholders on their receipt of distributions.
 
 
 2
 Plaintiff-appellant, San Francisco Real Estate Investors (SFREI), on October 28, 1982, made a tender offer of $40 a share (about $9 above the then current market price) for 34 percent of the shares (558,000) of defendant Real Estate Investment Trust of America (REITA). Acquisition of this amount of shares would give SFREI control of REITA. A brief account of SFREI's corporate "family" relationships and its present and potential holding of REITA's shares explaining how this result would be achieved is set forth in the margin.[2] REITA, a venerable Massachusetts business trust, tracing its origins from 1886, with a record of 340 consecutive dividends, invests in commercial and light industrial real estate, the value of such investments being estimated at $63 a share or approximately twice the market price per share.
 
 
 3
 Long before the tender offer, REITA had kept a watching brief on Mann and his corporate entities. REITA had several meetings with Mann in 1979 and 1980, and observed Mann's (or UCC's) acquisition of UAC, which thereafter gave up its status as a REIT, his unsuccessful but profitable effort to acquire another REIT, First Union, and the acquisition of a majority position in SFREI.[3] REITA's trustees concluded that they were on a "collision course" with Mann, and that not only was control of REITA his object, but that Mann's investment philosophy was not that of the steady and full distribution of income of a REIT but rather one of accumulating income and engaging in "high leverage" borrowing for reinvestment. In the spring of 1982, the trustees discussed, had counsel draft, and on May 24, three days after they learned of SFREI's stock purchases, adopted a by-law that precluded the possibility that over 50 percent of REITA's stock could be owned by five or fewer persons--a circumstance that, see n. 1, supra, could result in losing REIT status.[4]
 
 
 4
 Realizing that the by-law constituted a roadblock in its path, SFREI brought suit in the district court against REITA and its seven Trustees to enjoin enforcement of the by-law at the same time as it made its tender offer on October 28, 1982. Indeed, the completion of stock purchases under the tender offer was made conditional on obtaining a preliminary injunction against enforcement of the by-law. Five days later REITA counterclaimed, charging SFREI, Mann, UCC, and UAC with nondisclosure of their intent and fraudulent market manipulation, and seeking injunction of the tender offer.
 
 
 5
 Within a two week period voluminous affidavits, depositions, exhibits, and memoranda were assembled and on November 16, 1982 the district court heard argument and received brief testimony from one of REITA's officers at a hearing. On November 17 it denied SFREI's request to enjoin the by-law and granted REITA's motion for an injunction against the tender offer. We refused to stay the injunction but agreed to hear the appeal on an expedited basis.
 
 
 6
 Denial of SFREI's Request to Enjoin Enforcement of the By-Law
 
 
 7
 We first consider the court's refusal to enjoin enforcement of the by-law. Even though the injunction against the tender offer did not rest on the by-law, consummation of the offer expressly depends upon obtaining a ruling of its invalidity. Only if we could say that under no circumstances could we foresee the lifting of the injunction against the tender offer, which we cannot, could we reasonably avoid deciding this issue. As did the district court, we shall deal independently with both requests for injunctive relief.
 
 
 8
 The district court properly noted the familiar four part inquiry into (1) plaintiff's likelihood of success on the merits, (2) the irreparability of harm to plaintiff if relief is not granted, (3) the excess of such harm over harm to defendant if relief is granted, and (4) the adverse effect on the public interest if relief is granted. Agency Rent-A-Car, Inc. v. Connolly, 686 F.2d 1029 (1st Cir.1982). We note in addition the constraint laid on us to defer to the district court's action unless we find an abuse of discretion or error of law. Burgess v. Affleck, 683 F.2d 596 (1st Cir.1982); Crowley v. Local No. 82, 679 F.2d 978, 994 (1st Cir.1982). We agree with appellees that deference to factual determinations does not in this circuit diminish because most or all of the evidence is documentary. Custom Paper Products Co. v. Atlantic Paper Box Co., 469 F.2d 178, 179 (1st Cir.1972).
 
 
 9
 The court did not explicitly address the question, in the context of SFREI's request for an injunction, of REITA's irreparable harm should the operation of the by-law be enjoined. It seems clear to us, however, that it clearly felt that if the by-law were inoperative, Mann and companies might mount a successful and wholly legal tender offer effort, which would result in the change of control of REITA and loss of its REIT status, to the irreparable harm of REITA and its shareholders.
 
 
 10
 The court did address the harm that SFREI would suffer from denial of relief. Because SFREI conditioned its tender offer on the granting of preliminary injunctive relief, the court reasoned that it had lost nothing except time and money and, but for self imposed limitations of "economic rationality" and time, could still purchase shares at a premium. In so reasoning, we think the court erred as a matter of law. There can be no doubt that enforcement of the by-law would substantially chill, if not freeze in its tracks, any continued takeover effort. While time and money are lost, so also is diminished if not destroyed any chance of success. Whether one questions the wisdom of such efforts or not, the fact is that "loss of [a] best opportunity to seize control of a major corporation ... could be crucial." Dan River, Inc. v. Carl C. Icahn, 701 F.2d 278 at 284(4th Cir.1983); National City Lines, Inc. v. LLC Corp., 524 F.Supp. 906, 912 (W.D.Mo.1981), aff'd, 687 F.2d 1122 (8th Cir.1982). Congress has endeavored, in enacting the Williams Act governing takeovers, to assure a "policy of neutrality in contests for control", Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 29, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977), which is frustrated by unjustifiably delaying tender offers, Edgar v. MITE Corp., --- U.S. ----, ----, 102 S.Ct. 2629, 2637, 73 L.Ed.2d 269 (1982); Kennecott Corp. v. Smith, 637 F.2d 181, 190 (3d Cir.1980).
 
 
 11
 Not only did the district court's error, as we see it, in finding no risk of irreparable harm to SFREI disable it from balancing such risk against that faced by REITA, but it also prevented it from explicitly addressing the impact on the public interest should the by-law be enjoined. This part of the analysis, it seems to us, merges with our consideration of the merits. If the by-law was a perfectly proper one for REITA's trustees to enact and not in violation of the Williams Act, the public interest could not be said to be served by enjoining its enforcement; the public interest in stimulating a competitive assault would be at least balanced by seeing a defense in place. If, however, the by-law was not a proper expedient, the public interest would be ill served by allowing it to determine the outcome of the fight. We therefore consider the remaining factor, which we deem crucial in the weighing process--SFREI's likelihood of success in ultimately demonstrating the by-law to be illegal.
 
 
 12
 The district court first considered SFREI's charge that the by-law constituted a manipulative device used in connection with a tender offer, in violation of Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(e). It held that it was not persuaded that the by-law was enacted solely to prevent a tender offer, and that the Trustees, perceiving Mann's intention (through SFREI) as that of controlling REITA, were justified in enacting the by-law as "a reasonable and good-faith exercise of their business judgment." The court had earlier stated that "the by-law was a proper means to protect REITA's status." Addressing the contention that the by-law was unauthorized, the court began by noting that the plaintiff had not demonstrated that the enactment of the by-law was unauthorized, then observed that the trustees possessed "practically unlimited powers", and concluded that the enactment of the by-law "was a proper business judgment and entitled to some deference." This conclusion stemmed from the facts that no one had challenged the trustees' authority, SFREI had not called for a meeting of shareholders, similar provisions had been included in other REITs, and legal advice had been sought. The court specifically stated that it did not reach the question of the validity of the by-law, whether by fiduciary duty or the Declaration of Trust; even were breaches committed, such a fact would not change its conclusion that the trustees acted "in good faith and in the proper exercise of their business judgment."
 
 
 13
 REITA explicitly recognizes that more than a "good faith" defense is needed to prevail against both SFREI's Williams Act "manipulative device" claim and its breach of Declaration of Trust claim. It contends that, notwithstanding the court's disclaimer of any judgment on validity, there was "a reasoned succession of findings which together show that the By-Law was enacted lawfully in furtherance of an imperative duty vested in the Trustees." We acknowledge that this interpretation is not without support in the court's reference to the by-law as "a proper means" and to the powers of the Trustees as "practically unlimited". We therefore take the court's ruling on this basis.
 
 
 14
 We first deal with what we consider the dispositive issue at this juncture, the validity of the by-law as measured by the Declaration of Trust. REITA urges that we not underestimate the flexibility and even the authoritarian, oligarchical, and self perpetuating nature that can legally characterize a business trust. The Declaration obviously vests large powers in the seven Trustees. They serve for life (Section 8.2). Vacancies are filled only by the remaining Trustees (Section 8.4). They have "full and absolute power and control ... to the same extent as if [they] were the sole owners ... subject only to the limitations herein expressly stated" (Section 2.1). In addition to some sixteen itemized powers, they have power "to do all such other matters and things as in their judgment will promote or advance the business" (Section 2.19). In logical contrast the shareholders "shall have no interest ... other than the beneficial interest conferred by their shares" (Section 6.1). The Trustees also may adopt "by-laws for the conduct of their business, and in such by-laws may define duties of their officers, agents, servants, and representatives" (Section 8.8).
 
 
 15
 The Declaration of Trust does not, however, entirely overlook shareholders. A shareholder is entitled to a certificate which "shall be treated as negotiable and title thereto ... shall be transferred by delivery thereof to the same extent ... as a stock certificate" (Section 4.2). Although shares acquired by the Trustees shall not "either receive dividends ... or be voted" (Section 6.3), "shareholders of record of ... shares [entitled to vote] shall be entitled to vote and each full share shall be entitled to one vote" (Section 7.5). Trustees shall "distribute ratably among the shareholders" profits, surplus, or capital (Section 9.1).
 
 
 16
 In addition to the above powers vested in the Trustees and the rights vested in the shareholders is Section 6.5, which is specifically addressed to the danger posed to a REIT by excessive concentration of ownership. It reads in relevant part:
 
 
 17
 "If the Trustees shall at any time and in good faith be of the opinion that direct or indirect ownership of the shares of the Trust has or may become concentrated [so as to cause a loss of REIT status], the Trustees shall have the power to call for redemption a sufficient number of such shares [to maintain or bring ownership into conformity with REIT requirements] and/or to prevent the transfer of shares to persons whose acquisition thereof would result in a violation of such requirements."[5]
 
 
 18
 The newly enacted by-law recites that "Acting pursuant to the provisions of Section 6.5 ... the Trustees are of the opinion that ownership by any person of more than 9.8% of the outstanding Shares of the Trust is hereby deemed to constitute ownership which may become concentrated [so as to cause loss of REIT status]." It then sets forth the provisions we have earlier described, barring ownership of more than 9.8 percent of the shares, and classifying "Excess Shares" as not carrying voting rights, nor rights to dividends or other distributions. It also applies to individuals, corporations, and partnerships and incorporates all of the attribution rules of the Internal Revenue Code.
 
 
 19
 The parties agree that the determination of the power of Trustees in a Massachusetts business trust is a question of contract law, State Street Trust Co. v. Hall, 311 Mass. 299, 306, 41 N.E.2d 30 (1942). Agreement proceeds no farther. SFREI claims that the by-law is contradictory to and inconsistent with Section 6.5. REITA argues that while Section 6.5 is directed to a particular problem of actual or potential concentration posed by a known stock transfer, the by-law is a general prophylactic measure that "could be applied equitably to all REITA shareholders". REITA adds, appealingly, that "If the Trustees are empowered to block transfer of shares, or to redeem shares, to preserve REIT qualification, it must follow that the Trustees are empowered to take less drastic steps to deter ...."
 
 
 20
 Our problem is that we see no room for both Section 6.5 and the by-law to coexist, or more accurately, what function is realistically left to be served by Section 6.5. Because of the by-law's coverage of individuals and all other kinds of legal entities and all the elastic attribution rules, we can conceive of no situation in which Section 6.5 would be needed to forestall loss of REIT status. As our colleague Judge Aldrich has said in a vastly different context: "If there is a big hole in the fence for the big cat, need there be a small hole for the small one?" Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961) (quoted by Warren, Ch. J.)
 
 
 21
 In sum, what has happened with the enactment of the by-law is the effective repeal of Section 6.5 and the substitution of the by-law for it. Should this be attempted explicitly and directly through a by-law substituting a new Section 6.5, we suspect that the effort would run afoul of Section 10.1 of the Declaration of Trust requiring amendments to be effectuated by an affirmative vote of "three-fourths in interest of the shares then outstanding ... and entitled to vote".
 
 
 22
 Although REITA portrays the by-law as a less drastic step than the absolute proscription of transfer or redemption allowed by Section 6.5, its very preemptive and preventive approach adopts, in effect, an irrebuttable presumption of a circumstance giving rise to a good faith opinion of risk of impermissible concentration. This means that, for example, where no other shareholder owns over 3 percent or even 1 percent of the shares and where there is absolutely no foreseeable risk of undue concentration, a corporation or an individual would be barred from purchasing over 9.8 percent of the shares.
 
 
 23
 In addition to such overbreadth, very serious questions of conflict with both the Declaration of Trust and Massachusetts Law are raised by the restrictions the by-law imposes on "Excess Shares" as to transferability, receipt of dividends, and voting rights. REITA's assertions that in some instances Massachusetts law permits restrictions on transfer and that "a discouragement to some few hypothetical buyers" poses no conflict with Section 4.2 ring hollow to us, as does its attempt to distinguish Joseph E. Seagram & Sons v. Conoco, Inc., 519 F.Supp. 506 (D.Del.1981).[6]
 
 
 24
 As for receipt of dividends, Section 9.1, of the Declaration of Trust prescribing ratable distributions, together with Section 6.3, excepting Treasury shares, appear to conflict with the by-law, which requires that any distribution based on Excess Shares be put in a savings account and paid only to the holder when the shares are no longer Excess, i.e., to the purchaser from the holder of Excess Shares.[7] REITA seeks to distinguish Twenty-Seven Trust v. Realty Growth Investors, 533 F.Supp. 1028 (D.Md.1982) on the ground that in that case the requirement of ratable distributions was violated by the different forms of distribution, cash to small shareholders and secured notes to large ones, while here the amount and form of distribution per share are identical. Whether or not this is a salient distinction or whether, as SFREI argues, the distribution in the case at bar would, under Twenty-Seven Trust, be a fortiori a violation need not detain us, for we find it even more difficult to reconcile the accumulate-and-place-in-a-savings account provision of the by-law with the clear requirement of Section 9.1 to "distribute ratably among the shareholders " (emphasis supplied).
 
 
 25
 Finally, the voting rights guaranteed by Section 7.5 are obviously affected, at least during the period in which shares are deemed Excess. No real answer to this apparent inconsistency is attempted by REITA except to say that Treasury shares, shares jointly held by owners in disagreement, or shares subject to redemption have no vote by express provisions of the Declaration of Trust, and to distinguish several cases cited by SFREI. It is perhaps an understatement to say that the defense is not impressive.[8]
 
 
 26
 The one judicial precedent closest on point is Pacific Realty Trust v. APC Investments, Inc., 651 P.2d 163 (Or.App.1982). In that case a target REIT, whose declaration of trust contained a Section 6.17 with trustee powers to redeem and prevent transfer very similar to Section 6.5, after being confronted with a tender offer, enacted a by-law absolutely prohibiting anyone from owning more than 9.8 percent of the shares. The Trustees relied on their broad powers to conduct the business of the trust, a presumption (in the declaration) that their action lay within their general powers,[9] and their good faith in preserving REIT status--the essential purpose of the trust. The court posed the issue as whether the Trustees could lawfully adopt a by-law restricting the transferability of shares in a different and more stringent way than in the declaration of trust. It concluded that the by-law was "not authorized by, nor an implementation of, section 6.17". Id. at 166.
 
 
 27
 The district court distinguished Pacific Realty Trust on the grounds that the by-law there was "more far reaching" (i.e., that it completely barred ownership of excess shares) and was enacted after a tender offer had been launched. We are not sure that the analysis in Pacific is so easily disposed of. In any event we have relied on our own analysis. We do not pronounce final judgment on the validity of the by-law, but we do say that SFREI has demonstrated a likelihood of success on the merits of its claim that the by-law was not authorized by the declaration of trust.
 
 
 28
 At this junction, in light of the serious prospect of irreparable harm to SFREI, the intertwining of the impact on the public interest and the validity or not of the by-law, and our tentative view of its likely invalidity, we conclude that the district court committed legal error in refusing SFREI's motion for a preliminary injunction. We therefore have no occasion to pass upon the correctness of the court's holding that "plaintiff has not persuaded me on this record that the enactment of the offending by-law was a manipulative device".[10]
 
 
 29
 Granting of REITA's Request to Enjoin the Tender Offer
 
 
 30
 Belatedly, UCC challenges REITA's standing to assert claims under Section 13(d) of the Exchange Act, 15 U.S.C. Sec. 78m(d)(1)(C); it did not do so in the district court. The SEC in an amicus brief urges that we recognize a private right of action. We need not face the question. We do not view this issue as jurisdictional in an Article III sense[11] and just as we proceeded to the merits of the suit in General Aircraft Corp. v. Lampert, 556 F.2d 90, 94 n. 5 (1st Cir.1977), no challenge having been made to standing, so do we consider the issue not before us, the point having not been urged in the district court. Dobb v. Baker, 505 F.2d 1041, 1044 (1st Cir.1974).[12]
 
 
 31
 As was the case with its consideration of SFREI's request to enjoin enforcement of the by-law, the district court did not identify the harm that SFREI would suffer from an injunction against its tender offer, or balance that harm against the harm to REITA if the tender offer were allowed, or probe the impact on the public interest. It did determine, with ample support in the record, that REITA's loss of REIT tax status would constitute irrevocable harm. And, from what we have said earlier, we deem the loss of momentum and opportunity on the part of a tender offeror also to constitute irreparable harm. Once again we deem the issue on the merits to be the critical one, determining the public interest analysis, and outweighing whatever balance of hardship could be struck on this record. That is, if REITA's case for a preliminary injunction is likely to succeed on the merits, the fact that SFREI would lose a valuable opportunity to acquire control of REITA could not bar the injunction. Of course if REITA's case on the merits is not likely to succeed, we do not even reach the balancing of harms.
 
 
 32
 The district court held simply that REITA had shown that the counterclaim defendants had not complied "with the disclosure requirements of the federal securities laws" and thus should be enjoined. It then rehearsed what it viewed as a record showing that Mann and his companies had consistently masked their intent to obtain control of various REITs including REITA and had filed 13D forms describing the purpose of various stock acquisitions as "investment". Specifically with reference to SFREI's purpose in relation to its acquisitions of REITA's shares in May 1982, the court noted discussions concerning a takeover of REITA between Mann and New York counsel, the filing by SFREI of a 13D schedule on June 1, 1982, in which investment was the sole stated purpose, and a SFREI proposal on June 17 that REITA merge with SFREI coupled with the suggestion that if REITA resisted merger there might be a tender offer.[13] The court concluded in the light of "[t]his scenario" that REITA's shareholders had not been apprised of SFREI's future plans, its intent to gain control, the effect on REIT tax qualification, and the value of the underlying real estate.
 
 
 33
 UCC, UAC, and Mann make a spirited, point-for-point attack on the court's findings, alleging that all materials referred to were "true and complete in all material respects" and complaining that the court rejected without explanation the sworn statements of UAC and UCC officials. We are far from persuaded that the district court abused its discretion or that there was insufficient evidence to support its findings--particularly those relating to SFREI's disclosure relating to its intent in purchasing the shares of REITA. But all of this controversy over pre-tender offer conduct has been substantially reduced in importance by two subsequent developments.
 
 
 34
 The first is the tender offer itself. It is clear to us that the only "scenario" that was the subject of the court's scrutiny was the intent and 13D disclosures preceding the October 28, 1982 tender offer. In the Offer of Purchase of that date, several of the defects noted by the court were remedied: at least by this time there was a full discussion of the interrelations of Mann, UAC, UCC, and SFREI and the purpose of the offer was described as to enable SFREI to wind up with 51 percent of the shares, "all as a first step toward eventually acquiring the entire equity interest in REITA"; the offer stated that it was possible that a merger might be attempted; and the offer disclosed that SFREI's own "limited valuation analysis" in early 1982 produced an estimate of the value of REITA's assets on a liquidation basis as "approximately $103,350,000, or slightly more than $63.00 per Share."
 
 
 35
 As for the effect of successful completion of the tender offer on REITA's tax status, the Offer of Purchase discussed the Five Person Rule and stated that to SFREI's "best knowledge", Mann would be deemed to own only about 13 percent of the shares,[14] and there are three other stockholders who would be deemed to own 3, 1, and 1 percent of the shares respectively. Since SFREI was not aware of any other "individual or entity that owns or would be deemed to own" at least 32 percent, SFREI "does not believe that the consummation of the Offer would result in a violation of the Five Person Rule. The offer added that there could be no absolute assurance and cautioned that REITA and its shareholders (including SFREI) "could suffer substantial adverse tax and economic consequences" if REITA lost its REIT status.
 
 
 36
 Had the Offer of Purchase made sufficiently full disclosure of the defects noted by the district court we would face the question whether such "corrective disclosure" is sufficient to accomplish the purpose of giving REITA's shareholders an adequate basis for making an informed decision concerning the tender offer. Cf. General Aircraft Corp. v. Lampert, 556 F.2d 90, 97 (1st Cir.1977) (affirmed district court order enjoining further acquisitions until Schedule 13D was amended to reflect intentions accurately). On the other hand, the SEC in its amicus brief suggests that there are occasions when "[a]bsent a remedy beyond ordering corrective disclosure, a person will have little incentive to comply with the statute." It argues that in determining whether more than corrective disclosure is called for, we should, while taking care not to tip the balance between offeror and target sought to be achieved by the Williams Act, consider (1) whether a substantial number of shares were purchased after the misleading disclosures and before corrective disclosure, (2) whether the curative disclosure occurred simultaneously with or on the eve of a tender offer, and (3) whether the violation was egregious.
 
 
 37
 These seem like sensible tests. Measured by them, SFREI would probably pass the first test, since none of its shares were purchased after its June 1982 disclosure and half of UCC's shares were purchased before any disclosure, the remainder being acquired shortly after the two year old disclosure of December 1980.[15] It would arguably not pass the second test since the curative disclosures were made in the Offer to Purchase itself, although the subsequent delay and publicity of litigation may well have repaired this shortcoming. Finally, while having held that the district court's findings as to pre-offer non-disclosure could be sustained, we recognize the ambiguities of motivation revealed by the record and would not be disposed to call the violation "egregious".
 
 
 38
 But we do not feel that the district court was required to find that full corrective disclosure had been made. In its opinion it referred to uncontroverted affidavits indicating a substantial and imminent danger of REITA's losing its REIT status if the tender offer were not enjoined. These concerned the post-complaint discovery of the fact that SFREI was a 50 percent partner in a general partnership with one John Starkey. Two affidavits were submitted to the court on the day of its hearing, November 15, 1982, from tax specialists, one with extensive background in Regulated Investment Companies (subject to the same stock ownership and attribution rules as are REITs) and the other with extensive governmental and private law background in REITs. Each was of the opinion that if SFREI were to own 51 percent of REITA's stock and were a partner in a partnership with an individual, under the attribution rules of Section 544(a)(2) of the Code, that individual would be considered to own SFREI's 51 percent and REITA would no longer satisfy the Five Person Rule of Section 856(a)(1, 6).
 
 
 39
 In opposition to these opinions in the district court, SFREI relied on Estate of Netti S. Miller v. Commissioner, 43 T.C. 760 (1965), nonacquiesced, 1966-1 C.B. 4. In that case the Tax Court refused to apply an analogous attribution rule to the brother of a shareholder in a corporation where the brother had no interest in the corporation and could not bring pressure to influence its actions. Whether or not this case, involving application of the "Family Attribution Rule" to a foreign personal holding company, is apposite we do not know. What does seem relevant is that the I.R.S. has for the past 16 years maintained its nonacquiescence.
 
 
 40
 The essential point is that, whatever the final "right" decision on this esoteric point of law might be, the district court could well find that even the disclosure in the Offer to Purchase, which made no mention of the Starkey partnership, did not sufficiently inform shareholders of the full range of REIT qualification problems.
 
 
 41
 SFREI has attempted to cure this deficiency in two steps. First, in a December 7, 1982 "Amendment No. 5" to its Schedule 14D, filed in connection with its tender offer, SFREI argues its belief of counsel that Estate of Miller controls and says that it has proposed that Starkey transfer his partnership interest to a general partnership in which he and at least one other person would be the partners. Just how this would avoid the attribution problem is not made clear. Mr. Starkey was said, subject to advice of his counsel, to have indicated that he would cooperate.
 
 
 42
 A second step was taken on January 4, 1983, when SFREI filed "Amendment No. 6" to its Schedule 14D, stating that Mr. Starkey had now formed, not a general partnership as described in Amendment No. 5, but a limited partnership in which he is the general partner and three members of his family are limited partners. This limited partnership has been substituted as SFREI's partner in the general partnership. In counsel's view the fact that no individual is a direct partner of SFREI is sufficient insulation to block the attribution rule.
 
 
 43
 Amendment No. 6 then refers to a revelation in REITA's brief that SFREI is also the general partner in a Texas limited partnership with a number of individual limited partners. All SFREI says about this development is that it has undertaken "a comprehensive review" to identify "possible alternatives for restructuring the relationship".
 
 
 44
 These two "amendments", one attached to SFREI's main brief on appeal, the other to its reply brief, were of course not part of the record on which the district court acted. Nor do they constitute such full disclosure of facts and risks that we could confidently pronounce that all is now in order and that the tender offer may proceed. Because we are uncertain whether disclosure is, as yet, complete, we will not now set aside the district court's preliminary injunction. Rather, we remand to allow the district court to focus on whether, assuming a REIT status problem still exists, sufficient disclosure has been made to equip REITA's shareholders to make a decision. It may, of course, transpire that SFREI will feel that any REIT problems should be solved, to avoid application of Section 6.5 of REITA's Declaration of Trust.
 
 
 45
 We leave the preliminary injunction in effect temporarily for purposes related to the expeditious handling of this particular case. We do so, while recognizing that an injunction forbidding an acquisition is not, except in the most egregious case, the preferred or even proper remedy. In many situations failure to disclose can be cured by an order requiring appropriate disclosure. And, where that order is insufficient, injunctive relief should be designed to help the victims of the inadequate disclosure, not to hurt them. Typically, the victims are persons who tendered their shares prior to disclosure that would have made them realize the shares were worth more. With these persons in mind, Judge Friendly wrote in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir.1969);
 
 
 46
 "If the court believes that the offeror has improperly depressed the price of the stock before making the offer, it can require rescission and enjoin further solicitation for a period, or allow the offeror the alternative of raising the price of both past and future deposits."
 
 
 47
 In addition, where, for example, a putative acquirer has obtained a "blocking" position, an injunction might have the result of preventing shareholders who wish to sell from being able to do so on any terms. As we already have noted, see p. 1009 n. 15 supra, we think it unlikely that SFREI's tactics have given it any "unfair advantage" that complete disclosure could not cure, or that it has acquired a "blocking" interest that will ultimately frustrate higher bids by rival offerors and harm REITA shareholders. Our point is simply that even under circumstances more extreme than appear to be present here, injunctive relief should be tailored to advance the interests of those whom the Williams Act seeks to protect, not employed to punish an offeror at the expense of the persons the injunction purports to help.
 
 
 48
 Nonetheless, we are at present reluctant to order that the preliminary injunction be modified or dissolved, despite these concerns, for several reasons. First, we do not believe that an absolute ban on a tender offer is never appropriate under any circumstances. Second, the district court has not focused on the adequacy of disclosures both in and subsequent to the Offer of Purchase in order to determine whether sufficiently corrective disclosure has been made. Finally, and perhaps most pertinently, we have noted the unresolved specific issue of the adequacy of disclosures in SFREI's Amendments No. 5 and 6.
 
 
 49
 We therefore allow the preliminary injunction to remain in effect temporarily, and direct a full hearing on the merits of REITA's counterclaim forthwith. The district court is free to modify the preliminary injunction in the meantime if it feels such action is warranted. But, in light of the neutrality policy underlying the Williams Act and the desirability of avoiding delay as a factor tilting in favor of target management, the court should expeditiously reach a final decision on the counterclaim, in any event within two months from the time this opinion is issued.
 
 
 50
 The court's refusal to grant a preliminary injunction against enforcement of the by-law is reversed with directions to enter such a preliminary injunction; the court's refusal to grant defendants' motion to dismiss is affirmed.
 
 
 51
 The court's judgment granting a preliminary injunction against the tender offer is affirmed and the matter is remanded for further proceedings consistent with this opinion.
 
 
 52
 No costs.
 
 
 
 [1]
 Qualifying preconditions include annual distribution of 95% of taxable income, 75% of assets held in the form of real estate, 75% of income realized from real estate, at least 100 shareholders, and compliance with the "Five Person Rule": during the last half of a tax year, five or fewer individuals may not directly or indirectly (by attribution) hold more than 50% of the shares
 
 
 [2]
 Head of the "group" is a Canadian citizen, George S. Mann, who owns 60% of the shares of Unicorp Canada Corporation (UCC), a Canadian company. UCC owns 84.5% of the shares of Unicorp American Corporation (UAC), a Delaware corporation. UAC and UCC own 50.02% of SFREI. UCC, through purchases in 1979 and 1980, owns 10.6% of REITA's shares (173,200). In the spring of 1982 SFREI acquired 6.3% of REITA's shares (102,400), all purchased at a price of $30.50 a share. Because SFREI has an option to buy UCC's 10.6% and already owns 6.3%, successful prosecution of the 34% tender offer would make SFREI the holder of 51% of REITA's shares
 
 
 [3]
 Under a December 24, 1980 "standstill agreement" with SFREI, Mann, UCC, and UAC are limited to three of ten SFREI directorships and to their existing shareholdings until March 31, 1983
 
 
 [4]
 The by-law stated that "no person shall at any time be or become the owner of more than 9.8 percent of the outstanding shares of the trust". Despite the absolutist proscription of this sentence, the by-law goes on to provide that shares held in excess of this limit shall be "Excess Shares", which shall not be entitled to voting rights, shall not be entitled to dividends (until they cease to become Excess Shares), and are subject to redemption by the Trustees. The application of the by-law can be waived or suspended by the Trustees
 
 
 [5]
 A provision of this nature seems to be specifically contemplated by Treas.Reg. Sec. 1.856-1(d)(a), as a means of meeting the requirement of 26 U.S.C. Sec. 856(a)(2) that REIT ownership be represented by "Transferable shares":
 "Beneficial ownership. Beneficial ownership shall be evidenced by transferable shares, or by transferable certificates of beneficial interest.... Provisions in the trust instrument or corporate charter or bylaws which permit the trustees or directors to redeem shares or to refuse to transfer shares in any case where the trustees or directors, in good faith, believe that a failure to redeem shares or that a transfer of shares would result in the loss of status as a real estate investment trust will not render the shares 'nontransferable'."
 
 
 [6]
 We note also the possibility that the burden on, if not the absolute bar to, transferability constituted by the by-law, going beyond the provisions of Section 6.5, may jeopardize a REIT's status. See n. 5, supra; Pacific Realty Trust v. APC Investments, Inc., 59 Or.App. 425, 651 P.2d 163, 166 n. 5 (Or.App.1982). We add, however, that one of REITA's tax experts, Richard S. Koffey, has filed an affidavit in which he states his own opinion that the by-law "will not cause REITA's shares to be 'nontransferable' within the meaning of Section 856(a)(2) of the Code"
 
 
 [7]
 The Executive Vice President of REITA, C. Jerry Ragosa, gave the following deposition testimony (Vol I, p. 56), in answer to a question as to who would receive accumulated dividends upon a sale by a holder of Excess Shares:
 "Q. I want to know what your contemplation is as to who gets the dividends.
 A. My contemplation would be that the sale price of your shares would take into consideration a pool of money that was accumulated as a result of dividend distribution.
 Q. But that sales price would be calculated with the understanding that if I didn't unload these shares I was never going to get those dividends?
 A. As long as you were in excess of 9.8 percent."
 
 
 [8]
 The Chief Executive Officer of REITA, in deposition (Vol. 2, p. 135), pressed to explain why the by-law was not in effect an amendment of Section 7.5, testified:
 "Q. And the declaration of trust still provides, ... that each full share shall be entitled to one vote?
 A. It does.
 * * *
 Q. But it is no longer true ... that each REITA shareholder is entitled to one full vote for each full share that shareholder owns, is it?
 A. That is correct.
 Q. You have in effect amended the ... declaration of trust?
 A. I passed a bylaw which prohibits them to vote the shares that are excess.
 Q. You have effectively amended the declaration of trust?
 A. I don't know."
 
 
 [9]
 Section 3.27 of The Declaration provided:
 "The Trustees shall have power to do all such things and execute all such instruments as they deem necessary, proper or desirable in order to carry out, promote or advance the purposes of this Trust although such matters or things are not herein specifically mentioned. Any determination of the purposes of the Trust, or of the existence of any power or authority hereunder, made by the Trustees in good faith, shall be conclusive. In construing the provisions of this Declaration of Trust, the presumption shall be in favor of the grant of power to the Trustees."
 REITA points out that the Oregon court gave no weight to this section because it was seen only as "a catch-all clause at the end of a section setting forth the specific powers of the Trustees", 651 P.2d at 167, while the broad powers clause in REITA's Declaration, Section 2.1, comes at the beginning of Article 2.
 
 
 [10]
 We merely note our concern over the possibility that business enterprises, not merely real estate investment trusts, may, by internal by-laws or charter amendments, insulate themselves from takeover efforts. Whether or not the Williams Act proscribes such action is a matter on which we express no opinion
 We also appreciate the problems faced by REIT and Regulated Investment Company managements in trying to pierce through the protective foliage of "street names" and brokers to identify in advance when a particular purchase might, because of the almost medievally theological rules of attribution, result in the immediate five-year disqualification of a REIT. Perhaps the most sensible solution is that voiced by one of REITA's expert tax affiants, A. Stuard Young, Jr.: "I believe that remedial legislation is required to solve these problems."
 
 
 [11]
 Cf. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100 & n. 6, 99 S.Ct. 1601, 1608 & n. 6, 60 L.Ed.2d 66 (1979) (because of belated raising of issue whether a municipality was entitled to bring an action as a "private person" under Sec. 812 of the Fair Housing Act of 1968, 42 U.S.C. Sec. 3612, "the question ... is not properly before us, and we express no views on it.") Id. at 109 n. 21, 99 S.Ct. at 1612 n. 21
 
 
 [12]
 On November 24, 1982, after the district court's order issued, UCC, UAC, and Mann filed a reply to REITA's counterclaim which included the assertion that "Counterclaimants lack standing to assert their purported claims against [UAC, UCC] and Mann under Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act." We were informed of this fact only in UCC's reply brief. We do not consider the point as timely raised
 
 
 [13]
 Walker, the chief executive officer of SFREI, is remembered by Howland, REITA's chief executive officer, as saying that he thought the offer would be a partial tender offer--as in fact occurred [Vol. II, Howland deposition, p. 174]
 
 
 [14]
 This presumably flows from the following calculations:
 If SFREI were to own 51% of REITA:
 UAC's 50.02% interest in SFREI would be a 25.51% interest in REITA;
 UCC's 84.5% interest in UAC would be a 21.56 interest in REITA; and
 Mann's 58.5% interest in UCC would be a 12.94 or 13% in REITA.
 
 
 [15]
 REITA argues that corrective disclosure cannot provide a remedy for the alleged facts that nondisclosure enabled SFREI to buy its shares on the cheap and that, having effectively acquired 17 percent of REITA's shares, it is in a position to block other offerors. As for the first contention, there is no evidence that the tender offer price of $40 a share, the highest in REITA's history, is so egregiously low as to make inapplicable the principle that the selling shareholders have an adequate remedy in damages. Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 60, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). We observe also that REITA may also bear some responsibility for any lowering of price, since the price of REITA shares did dip after adoption of its by-law
 As for the second contention, conceding that an acquiring company should in some circumstances be immobilized for having improperly preempted the field, it is not an argument that REITA, having by its by-law shut the door to all those interested in acquiring over 9.8% of its shares, can gracefully make here.