**FLORIDA COMMERCIAL BANKS,**
Plaintiff-Appellant,

v.

**Hugh F. CULVERHOUSE, Sr. and the
John Doe Group, Defendants-Appellees.**

No. 84–5921.

United States Court of Appeals,
Eleventh Circuit.

Oct. 7, 1985.

Fay, Circuit Judge, dissented and filed opinion.

Paul J. Levine, Richard J. Bischoff, John S. Fletcher, Gary S. Koenigsberg, Robert M. Brochin, Morgan, Lewis & Bockius, Miami, Fla., A.A. Sommer, Jr., Morgan, Lewis & Bockius, Washington, D.C., for plaintiff-appellant.

Stephen DeTore, S.E.C., Robert Mills, Rosalind Cohen, Paul Gonson, Washington, D.C., for amicus curiae.

Michael R. Josephs, Haddad, Josephs & Jack, Denise V. Powers, Coral Gables, Fla., for defendants-appellees.

---

\* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

Before FAY and JOHNSON, Circuit Judges, and HOFFMAN \*, District Judge.

JOHNSON, Circuit Judge:

This appeal challenges the district court's dismissal of claims brought under Sections 13(d), 14(d), and 14(e) of the Securities and Exchange Act of 1934 ("Exchange Act"). Appellant asserts that those provisions provide a target corporation (or "issuer corporation") with a private cause of action to obtain corrective disclosures from a tender offeror who has filed with the Securities and Exchange Commission ("SEC"), and disseminated to shareholders, false and misleading tender offer materials. The district court dismissed the claims on the grounds that appellant did not have standing under those provisions to maintain this cause of action. We reverse.

Appellant Florida Commercial Banks, Inc. ("the Bank"), a Florida corporation, brought this action against Hugh F. Culverhouse, Sr. ("Culverhouse") and an unknown entity styled as the John Doe Group ("the Group"). In October 1981, Culverhouse's ownership of the Bank's common stock reached 5% of the shares outstanding; later that month Culverhouse filed with the SEC the required Schedule 13D, pursuant to Section 13(d) of the Exchange Act. Over the next three years, Culverhouse continued to acquire stock in the Bank and filed 12 amendments to the Schedule 13D. In August 1984, Culverhouse made a tender offer in which he sought to acquire enough shares to gain a controlling interest in the Bank, a total of approximately 54.8% of the Bank's outstanding common stock. At about that time, Culverhouse also filed with the SEC a Schedule 14D-1 Tender Offer Statement, pursuant to Section 14(d)(1) of the Exchange Act.

The Bank's amended complaint alleged that Culverhouse and the Group were engaged in a conspiracy that either would permit Culverhouse to acquire control of

the Bank for later resale to the Group, or would permit the Group to sell the Bank's stock to, or merge the Bank with, another unnamed financial institution. The complaint alleged that the Schedule 13D and its amendments failed to disclose Culverhouse's intention systematically to purchase the Bank's stock for other than "investment purposes," and his simultaneous negotiations with others for the sale of the Bank's stock. The complaint further alleged that Culverhouse made 23 material misrepresentations and omissions in the tender offer materials that he filed with the SEC and disseminated to shareholders. The complaint charged Culverhouse with violations of Sections 10(b), 13(d), 14(d), and 14(e) of the Exchange Act; and violations of Chapter 517 of the Florida Statutes. The Bank sought injunctive relief that would require Culverhouse to make corrective disclosures to cure the false statements and omissions in his tender offer materials, and would enjoin Culverhouse from proceeding further with the tender offer until such disclosures were made.

Culverhouse moved to dismiss for failure to state a claim, arguing that the Bank lacked standing under this Court's holding in *Liberty National Insurance Holding Co. v. Charter Co.*, 734 F.2d 545 (11th Cir.1984). The district court dismissed the federal claims with prejudice on the standing issue, citing only *Liberty National*, and dismissed the pendent state claim in the exercise of the court's discretion.

## I. Background of the Williams Act

■ Sections 13(d), 14(d) and 14(e) of the Exchange Act, adopted by Congress in 1968, are collectively referred to as the "Williams Act" amendments. The Williams Act was adopted in 1968 in response to the growing use of cash tender offers as a means for achieving corporate takeovers. *Piper v. Chris-Craft Industries*, 430 U.S. 1, 22, 97 S.Ct. 926, 939–40, 51 L.Ed.2d 124 (1977). The purpose of the Williams Act was to protect the investors in target corporations from takeover bidders who up to that point had been able to operate in secrecy. *See id.* at 26–29, 97 S.Ct. at 941–43. Congress did not enact the Williams

Act in order to protect either the tender-offeror or the target corporation but, rather, intended to maintain a neutral posture between the takeover bidder and existing management. *Id.* at 30–31, 97 S.Ct. at 943–44. The legislation was designed solely to get needed information to the investor. *Id.* at 31, 97 S.Ct. at 944. *See generally* S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 3, *reprinted in* 1968 U.S. Code Cong. & Ad.News 2811, 2813.

Section 13(d) of the Exchange Act requires that anyone who acquires more than five percent of any class of equity securities of a company registered with the SEC file with the Commission and the issuing company, as well as any exchanges on which the stock is traded, a Schedule 13D statement. This statement must set forth: (1) the background and identity of the purchaser; (2) the source of the funds used to purchase the securities; and (3) the purpose of the acquisition and the purchaser's future plans and intentions with respect to the issuer. *Liberty National, supra,* 734 F.2d at 550.

■ Section 14(d) requires that tender-offerors disclose certain prescribed information by filing it with the SEC. This information includes all the information that is required in a Schedule 13D statement. *Id.* at 551. Section 14(e) is a broad antifraud provision, proscribing misleading or fraudulent conduct, statements, or omissions in connection with tender offers. *Piper, supra,* 430 U.S. at 24, 97 S.Ct. at 940.

None of these provisions provides explicitly for causes of action on behalf of a target corporation or any other private party. *Liberty National, supra,* 734 F.2d at 554. Nonetheless, the Supreme Court has held that in some circumstances a private cause of action can be implied with respect to the Exchange Act's antifraud provisions, even where such provisions do not expressly provide for remedies. *Piper, supra,* 430 U.S. at 25, 97 S.Ct. at 941.

## II. This Court's Decision in Liberty National

In *Liberty National,* one company (Charter) accumulated approximately seven percent of the common stock of the target company (Liberty) and filed a Schedule 13D statement with several amendments. Liberty filed a complaint, alleging that Charter sought to accumulate enough shares of Liberty stock to enable Charter either to sell the shares at a control premium, or to coerce Liberty's management to give Charter business concessions to the economic detriment of the Liberty shareholders. Liberty alleged that Charter's actions violated Sections 13(d), 14(d), and 14(e) of the Exchange Act, as well as other securities laws. Liberty sought injunctive relief requiring Charter to divest itself of its holdings of Liberty stock and to refrain from voting its shares or otherwise exercising its rights in those shares pending such divestiture. *Liberty National, supra,* 734 F.2d at 548.

This Court held that Liberty did not have an implied right of action under Section 13(d) to expel an unwanted shareholder from the company. This Court also held that Sections 14(d) and 14(e) did not create implied rights of action on behalf of a target corporation for the type of injunctive relief sought. Although Sections 14(d) and 14(e) would apply only if Charter made a tender offer, this Court did not reach the question of whether Charter actually made a tender offer. *Id.* at 568.

The main focus of *Liberty National* concerned the question of whether providing an issuer corporation with a private right of action under the Williams Act would have a greater tendency to effectuate the purposes of the Williams Act by protecting the shareholders or, instead, would have a greater tendency to give the management an unfair advantage over tender offerors in takeover battles, ultimately to the detriment of the shareholders. The remedy that was requested in that case—divestiture—was clearly relevant to the issue of whether providing Liberty with the private right of action would tend to effectuate or thwart the purpose of the Williams Act to benefit the investor. The significance of the particular remedy sought in this Court's decision is apparent in the following passage from *Liberty National:*

> Congressional intent not to imply the right of action Liberty has brought is also made apparent when one focuses on the particular injunctive remedy Liberty seeks; it is both inappropriate and lacking in proportion to the wrong alleged. Section 13(d) creates an affirmative duty in a person after he has acquired more than five percent of the shares of an issuer to file a form for purely informational purposes. It strikes us that the obvious antidote for an allegedly false filing is a corrected filing. Yet Liberty does not request such a remedy. Instead, it seeks to force a major stockholder to unload its vast holdings and to lose its voting power over the shares it owns. The primary effect of such relief, if granted, would be to lower the market price of Liberty shares, which plainly would not be beneficial to the shareholders. This result would be plainly contrary to congressional intent in adopting the Williams Act.

*Id.* at 565 (citations omitted).

Appellants in the instant case do not seek to force the tender offeror to divest itself of its holdings in the Bank but, rather, seek to obtain corrective disclosures. In *Piper,* the Supreme Court addressed the question of whether Section 14(e) of the Exchange Act permitted the Court to read into the statute a damages remedy for unsuccessful tender offerors. *Piper, supra,* 430 U.S. at 25, 97 S.Ct. at 941. By focusing on whether that particular remedy was necessary to achieve the Congressional purpose of protecting the shareholders, the Court indicated that courts should consider the particular remedy sought in determining whether a statute implies a private right of action. Since the remedy that the plaintiffs sought in *Liberty National* was significantly different from the remedy sought in the instant case, this Court must independently determine whether the Bank should have a private right of action to obtain corrective disclosures from Culverhouse.

III. Whether Issuer Has Private Right of Action to Obtain Corrective Disclosures From Tender-Offeror

The Supreme Court has never directly decided the question of whether an issuer can obtain injunctive relief under the Williams Act. In *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), an issuer corporation sought an injunction forcing a shareholder, who owned over 5% of the issuer's stock, to divest himself of his holdings on the grounds that the shareholder had failed to make timely disclosure as required by Section 13(d) of the Exchange Act. The Supreme Court addressed the case on the merits and held that the issuer was not entitled to injunctive relief under the Williams Act, where the issuer could not show irreparable harm from the shareholder's actions.

Although the Court's denial of injunctive relief on the merits could be interpreted to mean that an issuer has standing to obtain such relief, the *Rondeau* Court explicitly stated that the question of the issuer's standing to obtain injunctive relief was not before it. *Rondeau, supra*, 422 U.S. at 62, 95 S.Ct. at 2078. Nevertheless, the Court indicated that it might recognize issuer standing to seek certain remedies, saying: "Of course, we have not hesitated to recognize the power of federal courts to fashion private remedies for securities laws violations when to do so is consistent with the legislative scheme and necessary for investors as a supplement to enforcement by the Securities and Exchange Commission." *Id.*

The Supreme Court has set forth four factors a court should consider in determining whether a statute creates an implied private right of action: (1) whether the plaintiff is a member of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff; and (4) whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based on federal law. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975). The Court has since held that these factors are not entitled to equal weight, and that the central inquiry must focus on the question of legislative intent. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979).

■ The fourth prong of the *Cort* test is the least relevant to legislative intent, but easily disposed of. The tender offer provisions of the Williams Act were intended to dominate the field. *Liberty National, supra*, 734 F.2d at 569; *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). It would therefore not be inappropriate to infer a cause of action under federal law, as opposed to state law. *Liberty National, supra*, 734 F.2d at 569.

To determine whether the legislature intended to create or preserve an implied private right of action on behalf of target corporations to seek corrective disclosures under the Williams Act, this Court will examine (1) whether the legislature has specifically indicated the intent to create or preserve such a private right of action, and (2) whether the purposes of the Williams Act would be furthered or thwarted by the creation of such a private right of action. *See generally Liberty National, supra.*

A. Whether Congress Specifically Intended to Create Private Right of Action For Issuer Seeking Corrective Disclosures

■ The Williams Act was first enacted after courts had had many years to interpret somewhat similar provisions of the Exchange Act governing proxy solicitations. Also, since the initial passage of the Williams Act in 1968, Congress has twice enacted amended versions of that Act. If courts had interpreted similar securities laws to provide implied private rights of action prior to the passage of the Williams Act, or had interpreted the Williams Act to provide implied private rights of action prior to the enactment of the amended versions, Congress's failure to address the is-

sue of private rights of action could be taken as evidence that Congress intended to preserve the implied private rights of action. *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 381–82, 102 S.Ct. 1825, 1840–41, 72 L.Ed.2d 102 (1982) (where Congress has conducted a comprehensive reexamination and significant amendment of a statute and left intact the statutory provisions under which the federal courts had routinely and consistently implied a cause of action, this is evidence that Congress affirmatively intended to preserve that remedy).

Only four years before the passage of the Williams Act in 1968, the Supreme Court held that Section 14(a) of the Exchange Act permitted a shareholder to sue for damages on behalf of the corporation to redress injuries from false and misleading proxy solicitation materials distributed in violation of that provision. *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). It could be argued that, given the Williams Act's origin in Section 14(a), Congress had ample reason to assume that the federal judiciary would imply certain private rights of action to enforce the newly enacted mandates. However, since *Borak* held that a stockholder had a private right of action, the fact that Congress might have intended to preserve this particular private remedy does not necessarily imply that Congress intended to preserve or create a remedy for the issuer corporation.

Only two years passed between the enactment of the Williams Act and the enactment of the first amended version of that Act in 1970, during which period there was no time for a consistent and routine judicial interpretation of the Williams Act to develop. However, by the time the second amended version of that Act was adopted in 1977, courts had consistently and routinely interpreted the Williams Act to provide for private rights of action on behalf of target corporations.[1] Because Congress in 1977 had ample notice of the existence of these judicially created private rights of action under the Williams Act, that Congress's failure to eliminate these rights of action legislatively is evidence that Congress intended the Williams Act to create private rights of action on behalf of target corporations. *See Liberty National, supra,* 734 F.2d at 563; *Indiana National Corp. v. Rich,* 712 F.2d 1180, 1184 (7th Cir.1983).

B. Whether Right of Action For Issuer Seeking Corrective Disclosures Would Further Purposes of Williams Act

■ The purpose of the Williams Act was to insure that shareholders who are confronted with a cash tender offer would not be required to respond without adequate information regarding the qualifications and intentions of the offering party. *Rondeau, supra,* 422 U.S. at 58, 95 S.Ct. at 2075–76. The shareholder needs this information for several reasons. First, if the tender offer is for less than all the outstanding shares and the shareholder decides to tender his shares, perhaps only some of the shares will be taken. In that case, the tenderor will remain a shareholder in the company, under a new management which he helped install without knowing its qualifications. Second, the information regarding who the bidder is and what he plans to do with the company might affect whether or not the shareholders can expect another bidder to match or exceed the price offered for the shares. *See id.* at 58 n. 8, 95 S.Ct. at 2076 n. 8.

■ While trying to increase the amount of information available to shareholders whose shares are solicited, Congress did not intend to create a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. *Id.* at 58, 95 S.Ct. at 2075–76. By requiring the disclosure of information to

---

1. *See, e.g., GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *General Aircraft Corp. v. Lampert,* 556 F.2d 90 (1st Cir.1977);

*Bath Industries, Inc. v. Blot,* 427 F.2d 97 (7th Cir.1970); *Missouri Portland Cement Co. v. H.K. Porter Co., Inc.,* 535 F.2d 388 (8th Cir.1976).

the target corporation as well as to the SEC, Congress intended to do no more than give incumbent management a chance to explain its position. *Id.*

■ In deciding whether to provide the target corporation with a private cause of action under the Williams Act to seek a particular remedy, a court should balance the likelihood that the shareholders will benefit by obtaining necessary information, against (1) the likelihood that shareholders will be harmed by the potential misuse of the cause of action by management seeking to thwart takeover attempts, and (2) the likelihood that shareholders will be harmed by other aspects of the particular remedy sought. In the instant case, where the particular remedy sought is corrective disclosures, there is no chance that shareholders will be harmed by the remedy. This Court needs only to balance the likelihood that the shareholders will benefit from the availability of this cause of action to the target corporation, against the likelihood that the shareholders will be harmed by the misuse of that cause of action by management.

■ Applying this test, we hold that under the Williams Act an issuer has a private right of action to seek the remedy of corrective disclosures. In most cases, shareholders simply cannot protect their own interests; they lack the resources to confirm the accuracy of information in a Schedule 13D of 14D–1. *See Indiana National Corp., supra,* 712 F.2d at 1185 n. 2. The SEC simply cannot police every tender offer or major acquisition subject to the Williams Act. The issuer is frequently in the best position to seek corrective disclosures within a time frame that will optimize the benefit to shareholders of such disclosures. *See GAF Corp. v. Milstein,* 453 F.2d 709, 721 (2d Cir.1971). We conclude that it is necessary to grant this private

right of action to issuers in order for the Williams Act to be effective.[2]

■ By providing issuers with this cause of action to enforce the Williams Act, this Court does not intend to allow the directors of corporations, who clearly have an economic interest in protecting their own positions, to use corporate resources simply to harass and burden aggressive outsiders. *See Liberty National, supra,* 734 F.2d at 567. If incumbent management attempts to tie up a tender offeror in litigation by unsupported allegations that the Schedule 13D statement of the tender offeror was false, courts should invoke appropriate sanctions under Rule 11 of the Federal Rules of Civil Procedure. Shareholders would also have their usual remedies for waste. *See GAF Corp. v. Milstein, supra,* 453 F.2d at 720.

Finally, we note that the SEC (as amicus curiae) urges that *Liberty National* was wrongly decided, and that this Court recommend *en banc* reconsideration of that case. In *Liberty National,* the issuer sought a remedy, divestiture, that would have *harmed* the shareholders by lowering the market price of Liberty shares. *See Liberty National, supra,* 734 F.2d at 565. The harm caused by divestiture, in addition to the harm caused by the potential misuse of the private cause of action by incumbent management, clearly would outweigh the benefit that private enforcement of the Williams Act would provide to the shareholders. Under those circumstances, this Court correctly held that the private right of action sought would be inconsistent with the purposes of the Williams Act. By advocating that this Court permit issuers to obtain the remedy of divestiture under the Williams Act, the SEC in effect asks this Court to tilt the balance in tender offer battles strongly towards the side of management,

---

**2.** Every other circuit which has addressed this question has held that an issuer has standing under the Williams Act to seek corrective disclosures from a tender offeror who has filed false and misleading disclosure statements. *See, e.g., General Aircraft Corp. v. Lampert,* 556 F.2d 90 (1st Cir.1977); *GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971); *Dan River, Inc. v. Unitex,*

*Ltd.,* 624 F.2d 1216 (4th Cir.1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *Indiana National Corp. v. Rich,* 712 F.2d 1180 (7th Cir.1983); *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240 (8th Cir. 1979); *Pacific Realty Trust v. APC Investments, Inc.,* 685 F.2d 1083 (9th Cir.1982).

at the expense of both the tender offeror and the shareholders. This argument undercuts the position of the SEC as disinterested enforcer of the Williams Act.

The order of the district court dismissing appellant's claims under Sections 13(d), 14(d), and 14(e) of the Exchange Act is REVERSED. This case is REMANDED to the district court for further consideration of those claims.

FAY, Circuit Judge, dissenting:

Unable to read *Liberty National* as narrowly as the majority, I respectfully dissent. I would affirm the dismissal.