**AMERICAN CARRIERS, INC., Plaintiff,**

v.

**BAYTREE INVESTORS, INC., Gilbert K. Granet, and Christopher A. Jansen, Defendants.**

Civ. A. No. 88–2067.

United States District Court,
D. Kansas.

Feb. 29, 1988.

Kent E. Whittaker, Hillix, Brewer, Hoffhaus, Whittaker & Horner, Kansas City, Mo., Richard T. Sharp, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, William Hankins, Overland Park, Kan., for plaintiff.

Michael E. Lazzo, Baker & Sterchi, Overland Park, Kan., Thomas E. Rice, Jr., Phillip C. Rouse, Baker & Sterchi, Kansas City, Mo., Peter G. Swan, Emalfarb, Swan & Bain, Highland Park, Ill., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is presently before the court on defendants' motion to dismiss and on plaintiff's motion for a preliminary injunction against defendants, seeking to: (1) enjoin the defendants from making or announcing a tender offer for American Carriers, Inc. stock unless prior to making any such offer defendants make a "corrective" disclosure of their February 3rd tender offer by complying with the Securities Exchange Act of 1934, make a re-scission offer to all American Carriers shareholders who purchased shares from February 3 through February 17, 1988, and divest themselves of all American Carrier shares of which they are (or will become as the result of the rescission offer) the beneficial owner; (2) enjoin defendants from voting or otherwise exercising any rights with respect to their American Carriers stock; and (3) require defendants to comply with the Securities Act of 1933 and the Securities Exchange Act of 1934 in any future attempts to "acquire or influence the control of American Carriers, Inc., either by means of a tender offer, merger, proxy contest or otherwise[.]" The court entertained plaintiff's *ex parte* request for a Temporary Restraining Order against defendants on February 11, 1988. Upon plaintiff's posting a $5,000.00 bond with the court, we granted plaintiff's request, temporarily enjoining defendants from acquiring any shares of American Carriers stock and from announcing any offer or plan to purchase or acquire said stock or from otherwise engaging in any acts constituting a tender offer for the stock of American Carriers, Inc.

The parties were allowed to engage in limited, accelerated discovery to prepare for a hearing on plaintiff's preliminary injunction motion, which hearing was held February 19, 1988. After considering the parties' briefs, oral arguments, and exhibits, we are now prepared to rule on this motion and make the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff American Carriers, Inc. [hereinafter "ACI"], through its subsidiaries, operates a nationwide motor freight transportation system. ACI headquarters in Overland Park, Kansas. In October 1987, ACI acquired Smith's Transfer Corporation, and since that acquisition has become the fourth largest company in the motor carrier industry.

2. ACI stock is traded in the NASDAQ national market system. Although ACI reported a $2.3 million loss for the third quarter of 1987, as of November 28, 1987,

ACI had total assets approximating $230 million, employed approximately 11,000 people, and operated more than 4,000 tractors and trucks. More than 10,000 shareholders hold approximately 7,600,000 shares of outstanding common stock. Since its 1983 public offering, ACI's stock decreased in price from approximately $20 per share to approximately $5 in December 1987.

3. Defendant Baytree Investors, Inc. [hereinafter "Baytree"] is an Illinois corporation purporting to be in the investment banking business. Baytree's principal place of business is in Chicago, Illinois.

4. Defendant Gilbert K. Granet [hereinafter "Granet"], the Chairman of Baytree, is a resident of the State of Illinois.

5. Defendant Christopher A. Jansen [hereinafter "Jansen"], the President of Baytree, is also a resident of the State of Illinois.

6. Defendants' first communication of their interest in making a tender offer for ACI stock occurred in a January 11, 1988, letter from Granet to Leon H. Robertson, ACI's Chairman of the Board, President, and Chief Executive Officer [hereinafter "Robertson"]. This letter provided:

> We would be interested in proposing a tender offer for 80% of your company, with current management owning approximately 49% of the acquisition company.
>
> . . . .
>
> Our Offer would be conditioned upon a minimum of 67% of the outstanding shares being tendered and not withdrawn, approval of the majority of your board of directors, and completion of our due diligence and financing. We believe that the entire transaction can be completed within 60 days after reaching a definitive agreement with your board of directors.
>
> We would appreciate hearing from you within the next five days, with respect to your interest in considering an Offer for the company.

This same letter provided no information about Baytree's background, activities, financial condition, ability to finance the proposed tender offer, or plans for ACI and the remaining 20% of the stockholders.

7. On January 13, 1988, Baytree widely publicized its proposal to acquire 80% of ACI's stock.[1] The announcement immediately resulted in an ACI stock price increase. Between November 1, 1987, and January 12, 1988, ACI stock had traded consistently between $4 and $6 a share. ACI stock closed at $5⅝ on January 12, 1988. On the day of Baytree's first announcement, however, ACI stock rose to a high of $7⅛, a 27% increase over January 12th's closing price, making ACI stock the second highest percentage gainer on the NASDAQ national market system on January 13, 1988.

8. The January 13th announcement also resulted in a dramatic increase in ACI stock's volume of trading. In early January 1988, the daily trading volume for ACI stock ranged between 1,800 and 26,600 shares. On January 13th, the trading volume was 98,400 shares, a 370% increase over the highest daily volume in early January.

9. Robertson wrote Granet on January 13, 1988, responding to Granet's January 11th letter and requesting information about the identity, background, and financial condition of Baytree and its principals; the availability, source, amount, and structure of financing for Baytree's proposed tender offer; and a description of Baytree's plans for the future of ACI and its shareholders. Robertson's letter was an attempt to obtain data ACI needed in order to make an informed investment decision regarding the tender offer, and requested no more information than the Securities Exchange Act of 1934 requires be disclosed.

10. In an interview with *The Kansas City Times* on January 16, 1988, Jansen reiterated Baytree's intentions to acquire

---

**1.** Although defendants claim that ACI also publicized the offer, they offer no evidence of an ACI-generated press release. However, defendants did, in fact, make such a press release over the Dow Jones News Service. *See* Complaint, Ex. E.

ACI. Although Jansen admitted that "his group" had purchased ACI stock, he would not divulge the quantity of stock his group held. Jansen also did not divulge any information regarding his background, Baytree's financial backing for the proposed tender offer, or the specific terms of the offer.

11. In an interview with the *Journal of Commerce* on January 22, 1988, defendant Jansen stated that Baytree would make a formal tender offer for ACI stock that week. Despite questions concerning Baytree's ability to finance its tender offer, Jansen offered no information about Baytree's financial condition.

12. After defendants' public announcements, ACI began receiving inquiries from customers and employees, who expressed concerns about ACI's long term future and stability.

13. Robertson again wrote to Granet on January 26, 1988, reiterating ACI's request for specific information about the identity and background of Baytree and its principals, among other things.

14. In response to Robertson's January 26th letter, Granet responded by letter dated January 28, 1988. The letter provided as follows:

> We would like to propose to acquire 51% of the outstanding shares of the company through a tender offer, subject to approval of the majority of your board of directors, at a price of $15 a share. This would represent a substantial premium over the stock price. In the alternative, we would cause to be made available sufficient funds to pay out a dividend to stockholders of $7.50 a share, while we would obtain a 49% voting, but non-dilutive equity stake in the company.

Again, Granet's letter did not provide any of the information previously and repeatedly requested by ACI.

15. Robertson responded to Granet's January 28th letter with a letter dated February 2, 1988. Robertson stated that ACI

doubted "the credibility of the Offer and Baytree's motives in making it." Also, Robertson renewed ACI's request for detailed financial data from Baytree in order to allow the Board to make an informed decision regarding the tender offer. ACI released the contents of Robertson's letter to the news media on February 3, 1988.

16. As with their prior 80% offer, defendants publicized their 51% offer.[2] Defendants' new offer was published in *Traffic World,* a widely-read weekly magazine devoted to transportation and distribution, and *Transport Topics,* a magazine published by the American Trucking Association which is read throughout the transportation industry.

17. On February 3, 1988, the *Journal of Commerce* published an article which recited the material terms of the tender offer from Granet's January 28th letter (*i.e.,* the percentage of shares sought, the price per share, and the class of stock sought), and which stated that the offer was subject to approval by ACI's Board of Directors. The *Journal of Commerce* article was the first to widely disseminate Baytree's offering price.

18. On February 4, 1988, *The Kansas City Times* also published an article regarding Granet's January 28th 51% tender offer at $15.00 a share.

19. In a reaction similar to the one occurring after defendants' announcement of its first 80% tender offer for ACI, the market price of ACI rose to a high of $10 per share on February 3, 1988, compared to a price ranging between $5¾ and $6⅝ during the period January 14—February 2. Additionally, the trading volume of ACI stock on February 3rd was 421,616 shares. According to Salomon Brothers, Inc., more than 13% of ACI stock was traded between February 3 and 2:30 p.m. on February 4, and "the arbitrage community ... accounted for virtually all of this trading activity." In their unsolicited letter dated February 4, 1988, Salomon Brothers also observed that

---

2. According to the plaintiff, defendants mailed copies of Granet's January 28th letter to the press. This claim was corroborated by Jim Davis' testimony. Mr. Davis is a reporter for the *Kansas City Times.* Although Mr. Davis did not personally receive a copy of the letter, the *Times* did receive Granet's January 28th letter, and Mr. Davis used it as support for his articles.

ACI's stock was "in play," *i.e.*, that long-term shareholders had sold their ACI stock to short-term traders and market professionals.

20. On February 5, *The Kansas City Times* published a statement made by Jansen, which statement indicated that defendants' tender offer might be less than genuine. The newspaper article stated:

> Christopher A. Jansen, Baytree's president, said that his prime interest was to boost American Carriers' stock price because his group owned a large chunk of it.
>
> . . . .
>
> In addition, Baytree siad it would favor a competing takeover offer that would pay more than $15 a share.

21. On February 8, 1988, Granet sent Robertson another letter. Granet also released the letter's contents to the press. Granet provided none of the requested financial data. Instead, the letter made general attacks on ACI's management and directors.

22. Despite the Temporary Restraining Order issued February 11, 1988, the defendants issued a press release the same day, stating that "We intend to pursue our intention with respect to obtaining control of the company."

23. On February 12, 1988, the *Wall Street Journal* publicized ACI's rejection of defendants' 51% tender offer.

24. On February 18, 1988, defendants announced through the press that its offer for ACI became "null and void due to [ACI's] board refusal to endorse the offer." Nevertheless, Jansen indicated to *The Kansas City Times* that he intended to leave "the door open for his group to renew its interest."

25. In addition to financial information, defendants have failed to reveal information concerning past activities, as required by the Securities Exchange Act of 1934. ACI and the news media discovered through other sources, however, that defendants' past activities have not gone unnoticed. In 1983, the Securities and Exchange Commission filed a complaint against defendant Jansen in the United States District Court for the District of Columbia. In its complaint, the SEC alleged that during a proxy contest for election to Titan Group, Inc.'s Board of Directors in 1981 and for election to Wieboldt Stores, Inc.'s Board of Directors in 1982, Jansen violated the anti-fraud provisions of the securities laws by: (1) instituting litigation; (2) causing adverse publicity to the subject company; (3) making an exchange offer; and (4) offering to cease these activities in exchange for payment. Jansen consented to the entry of a "Final Judgment of Permanent Injunction" against further violations of the laws concerning tender offers and proxy solicitations. *See* SEC Release No. 9995, May 11, 1983, [available on WESTLAW, FSEC–DKT database], LEXIS, SEC library.

26. In 1981, the Commodities Futures Trading Commission [hereinafter "CFTC"] found that Jansen, who was then conducting business under the name "Jankowski," had "cheated and defrauded" customers as a commodities futures trader by misappropriating customer's funds, churning accounts, and reporting fictitious transactions to customers. Because of these activities, the CFTC revoked "Jankowski's" registration. Jankowski thereafter changed his name to Jansen.

27. Defendants are also currently defendants in a lawsuit instituted by U.S. Truck Lines, Inc., in the Northern District of Ohio. In its complaint, U.S. Truck Lines alleges that defendants issued press releases leading investors to believe that defendants were going to make a tender offer for U.S. Truck Lines, that defendants never complied with SEC disclosure requirements for making a tender offer, that defendants lacked the financing to consummate a tender offer for U.S. Truck Lines stock, and that defendants offered to cease their disruptive scheme for a payment of at least $550,000.

28. Despite the lawsuit instituted by U.S. Truck Lines, defendants told the press and ACI that they had reached an agreement with U.S. Truck Lines to "buy it out" in conjunction with ADM Acquisition Corp., who Granet represented to be Baytree's

partner. Although it is true that ADM and U.S. Truck Lines have agreed to a merger, ADM is not Baytree's partner. In a February 11th press release of its own, ADM stated:

ADM and its principals are not partners of Baytree or its principals or otherwise affiliated with Baytree or its principals in this acquisition. Any statements to the contrary by Baytree are false.

ADM's legal counsel has demanded that Baytree cease making false representations with respect to any affiliation between Baytree and ADM with respect to this acquisition.

29. In the present case, defendants to date have not filed the disclosures required by the Securities Exchange Act of 1934, specifically section 14(d) (15 U.S.C. § 78n(d)). Additionally, defendants have failed to make the required filing for terminating their tender offer. *See* 17 C.F.R. §§ 240.14d–2 and 240.14d–100, General Instruction D.

30. Plaintiff claims current and continuing injuries from defendants' public statements about their intent to acquire through a tender offer a controlling interest in ACI stock. First, ACI claims that defendants' actions have given ACI employees feelings of job insecurity, leading to a deterioration of morale and a decline in productivity. Second, uncertainty about ACI's future has contributed to the resignation of sales and management personnel and has undermined customer confidence. Three national Account Directors, one Director of Sales Development, three city Sales Managers, and six Sales Representatives have resigned recently, and customers have expressed concern over the uncertainty caused by Baytree's expressed desire to consummate its tender offer. Third, ACI's Board of Directors have had to direct their attention to responding to defendants' tender offer, thus diverting their attention from managing ACI's day-to-day business affairs. Finally, ACI's shareholders have been forced to make uninformed decisions concerning the sale of their stock without access to material information that defendants are required by law to provide.

*Conclusions of Law*

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 15 U.S.C. § 78aa, and under the doctrine of pendent jurisdiction. Likewise, venue is proper in this district, as the acts and transactions complained of have taken place and continue to take place within this district, the claims have arisen within this district, and the plaintiff's alleged injury has been and will continue to be suffered within this district.

Plaintiff seeks relief in the form of a preliminary injunction restraining defendants from making a tender offer or announcing their plan to acquire ACI stock through a tender offer unless defendants: (1) make the appropriate filings required by section 14(d) of the Securities Exchange Act of 1934 for the February 3rd tender offer; (2) make a rescission offer for stocks purchased from February 3 through February 17, 1988; and (3) divest themselves of their ACI shares. Additionally, plaintiff seeks to enjoin defendants from voting their ACI stock, and seeks to require defendants' compliance with the securities laws if they attempt a tender offer of ACI in the future.

■ The Tenth Circuit recently reiterated the standards governing a motion for preliminary injunction in *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir.1986). In order to obtain a preliminary injunction, the moving party must establish the following four factors:

(1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Id.* at 355; *see also Otero Savings & Loan Ass'n v. Federal Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir.1981); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th

Cir.1980). When the first three requirements for a preliminary injunction are satisfied, the moving party's burden of proof on the fourth requirement is lessened. "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782 (10th Cir.1964) (citing *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953)); *see also Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1436 and n. 4 (10th Cir.1987).

■ The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case." *Tri–State,* 805 F.2d at 355; *Continental Oil,* 338 F.2d at 781. In the instant case, plaintiff seeks both a prohibitory and a mandatory injunction. The plaintiff seeks not only to preserve the status quo, but also asks the court to grant it affirmative relief by requiring the defendants to make a rescission offer and divest their shares. Because mandatory preliminary injunctions disturb rather than preserve the status quo, "[i]t is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedial remedy process not favored by the courts." *Citizens Concerned for Separation of Church & State v. City & County of Denver,* 628 F.2d 1289, 1299 (10th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981); *accord Committee of Central American Refugees v. INS,* 795 F.2d 1434, 1441 (9th Cir.1986); *Jordan v. Wolke,* 593 F.2d 772, 774 (7th Cir.1978); *Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir.1980); *see also* 42 Am.Jur.2d *Injunctions* §§ 16, 17, 20 (1969). Consequently, mandatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party. *See, e.g., Anderson v. United States,* 612 F.2d 1112 (9th Cir.1979); *Martinez v. Mathews,* 544 F.2d 1233 (5th Cir. 1976); *Clune v. Publishers' Ass'n of New York City,* 214 F.Supp. 520 (S.D.N.Y.),

*aff'd per curiam,* 314 F.2d 343 (2d Cir. 1963).

Considering the requisites for mandatory injunctive relief, the court concludes that plaintiff cannot meet the more stringent requirements as they apply to plaintiff's request for rescission and divestiture; therefore, we must deny plaintiff's request for these mandatory injunctions. We also must deny plaintiff's request for a preliminary injunction prohibiting defendants from exercising their voting rights. Plaintiff simply did not meet its burden of proving that defendants' voting their shares would cause harm to ACI or its stockholders. The remainder of plaintiff's preliminary injunction request will be granted; that is, defendants will be enjoined from making or announcing the making of a tender offer until it has complied with the securities laws as to its past tender offer and as to any future tender offers it may wish to make for ACI stock.

*Likelihood of Success/Serious Questions*

As our later discussions of the other three requirements will show, the court has determined that plaintiff meets these requirements for a preliminary injunction, and therefore has a lessened burden of proof on the "likelihood of success on the merits" requirement; *i.e.,* plaintiff only needs to raise serious or substantial questions which provide a fair ground for litigation. *Ewing,* 823 F.2d at 1436. Plaintiff easily meets this burden. Additionally, however, the court has determined that plaintiff could also meet the greater burden of proving a likelihood of success on the merits.

■ In support of its motion for preliminary injunction, plaintiff alleges that defendants violated sections 14(d), 14(e) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78n(d), 78n(e), and 78j(b)), and it is these violations which plaintiff seeks to enjoin. Sections 14(d) and 14(e) are part of the Williams Act, which Congress enacted in 1968 in response to the increased use of cash tender offers for corporate takeovers, which offers were outside the reach of the existing federal

securities disclosure requirements. *See Piper v. Chris–Craft Industries,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977). The purpose of the Williams Act was to protect public shareholders by insuring that they would have adequate information about the tender offeror and his plans for the target company before having to decide whether to sell or retain their shares. *Id.* at 35, 97 S.Ct. at 946; *see also Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 55 (2d Cir.1985). Prior to the Williams Act, a tender offeror had no obligation to disclose information to shareholders of the target company. *Hanson Trust,* 774 F.2d at 55.

In keeping with this purpose, section 14(e) is a general anti-fraud provision, which provides in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer....

15 U.S.C. § 78n(e). Section 14(e) was modeled after Rule 10b–5 (17 C.F.R. § 240.10b–5), which was promulgated under section 10(b) of the 1934 Act. *See, e.g., Panter v. Marshall Field & Co.,* 646 F.2d 271, 283 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Both sections 14(e) and 10(b) manifest the philosophy of full disclosure embodied in the Exchange Act. *See generally, Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

■ Section 14(d) sets forth the disclosure requirements, which include having the tender offeror file prescribed information with the SEC. *See, e.g., Florida Commercial Banks v. Culverhouse,* 772 F.2d 1513, 1515 (11th Cir.1985). The information required to be filed includes all the information required in a Schedule 13D statement, namely: "(1) the background and identity of the purchaser; (2) the source of the funds used to purchase the securities; and (3) the purpose of the acquisition and the purchaser's future plans and intentions with respect to the issuer." *Id.* In order to be subject to section 14(d)'s requirements, the offer must meet three conditions. First, the offer must be in the form of a tender offer. Second, the purchase must result in the offeror being the beneficial owner of more than 5% of a class of shares. Third, the securities purchased must be registered on a national exchange (*i.e.,* section 12 securities).

■ Defendants claim that plaintiff cannot succeed on the merits of its claims and that the action should be dismissed for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6) because the plaintiff lacks standing and because defendants' offer did not constitute a tender offer. Although the Supreme Court has not expressly addressed the question of whether a private cause of action for an injunction lies under sections 14(d) and 14(e), the Court indicated a willingness to recognize such a cause of action "when to do so [would be] consistent with the legislative scheme and necessary for investors as a supplement to enforcement by the Securities and Exchange Commission." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 62, 95 S.Ct. 2069, 2078, 45 L.Ed.2d 12 (1975). Given this direction by the Supreme Court, lower courts have held that an issuer-corporation has standing under the Williams Act to seek various remedies, including injunctive relief. *See, e.g., Florida Commerical Banks,* 772 F.2d at 1517; *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 714–15 (5th Cir.1984); *Pacific Realty Trust v. APC Investments, Inc.,* 685 F.2d 1083 (9th Cir.1982); *Milstein v. Huck,* 600 F.Supp. 254, 263 (E.D.N.Y.1984).

In the *Florida Commercial Banks* case, the Eleventh Circuit established a balancing test to determine whether a target corporation has standing to pursue a private cause of action under the Williams Act:

[A] court should balance the likelihood that the shareholders will benefit by obtaining necessary information, against (1)

the likelihood that shareholders will be harmed by the potential misuse of the cause of action by management seeking to thwart takeover attempts, and (2) the likelihood that shareholders will be harmed by other aspects of the particular remedy sought.

*Florida Commercial Banks*, 772 F.2d at 1519. In the case at hand, there is no evidence that ACI is seeking this injunction to prevent defendants' takeover attempt. Rather, ACI is seeking to protect its shareholders by requesting that defendants provide what the shareholders are entitled to under the Williams Act—information. In the *Florida Commercial Banks* case, the offeror had supplied inaccurate information in its SEC filings; thus, the court determined that allowing the issuer to pursue a cause of action under the Williams Act was the best way to protect its shareholders' interest. As the court stated:

> "In most cases, shareholders simply cannot protect their own interests; they lack the resources to confirm the accuracy of information in a Schedule 13D of 14D–1.... The issuer is frequently in the best position to seek corrective disclosures within a time frame that will optimize the benefit to shareholders of such disclosures."

*Id.* Similarly, under the circumstances of this case, ACI is in a much better position to obtain disclosure from the defendants than are its shareholders.

There is also no evidence that requiring defendants to comply with the Williams Act will harm ACI's shareholders. Indeed, if the court concluded that ACI did not have standing to bring this action, the shareholders would not be protected from the very harm against which the Williams Act was designed to guard. Consequently, we hold, as did the Eleventh Circuit, that it is necessary to recognize ACI's standing under sections 14(d) and 14(e) in order to give effect to the Williams Act. By recognizing ACI's standing in this case, we in no way wish to upset the neutral application of the Williams Act. *See Hanson Trust*, 774 F.2d at 55, 60 (Congress sought to avoid "favoring either existing corporate management or outsiders seeking control

through tender offers"). Plaintiff is admonished, therefore, that it should not use its ability to bring a cause of action under the Williams Act to harass those making valid, legal tender offers. *Florida Commercial Banks*, 772 F.2d at 1519.

Plaintiff's standing under section 10(b) is more problematic. Generally, 10(b) standing requires that the plaintiff be either a purchaser or seller of the securities in the transaction at issue. *See, e.g., Atlantic Federal Savings & Loan Ass'n of Fort Lauderdale v. Dade Savings & Loan Ass'n*, 592 F.Supp. 1089, 1092 (S.D.Fla. 1984); *Equity Oil Co. v. Consolidated Oil & Gas, Inc.*, 596 F.Supp. 507, 513–14 (D.Utah 1983); *W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc.*, 466 F.Supp. 800, 805–06 (D.Neb.1979). Some courts have recognized a narrow exception to this general rule, however, when the plaintiff seeks to enjoin continuing or future violations of section 10(b). The courts recognizing this exception usually limit it to prospective purchases or sales of securities; that is, the exception does not apply when actual purchases/sales have been completed. *See, e.g., Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1494 (D.Del.1984); *Hanna Mining Co. v. Norcen Energy Resources Ltd.*, 574 F.Supp. 1172, 1198 (N.D.Ohio 1982); *Fuchs v. Swanton Corp.*, 482 F.Supp. 83, 89 (S.D. N.Y.1979). The Tenth Circuit expressly reserved ruling on the issue of non-purchaser/seller standing under section 10(b) in *Westinghouse Credit Corp. v. Bader & Dufty*, 627 F.2d 221, 223 (10th Cir.1980). Accordingly, we hesitate to conclude that plaintiff has standing to pursue its 10(b) injunction claim against defendant. We find it unnecessary to make a determination regarding plaintiff's 10(b) standing, however, because of our earlier conclusion that plaintiff has standing under section 14(e). Since section 14(e) and rule 10b–5 are coextensive in their anti-fraud prohibitions, they are construed *in pari materia* by courts. *Panter*, 646 F.2d at 282. Consequently, it is enough at this point in time that plaintiff has standing under section 14(e) to meet its burden of establishing a

"likelihood of success on the merits" as to its anti-fraud claims.

Defendant also claims that plaintiff cannot succeed on the merits of its claims because their offer did not constitute a tender offer, as that term is defined by the case law, and defendants are therefore not subject to section 14(d)'s disclosure requirements. As we expressed at the hearing February 19th, we find little merit in defendants' argument.

Congress and the SEC have intentionally failed to define "tender offer," because they were concerned "that a rigid definition would be evaded[.]" *Hanson Trust*, 774 F.2d at 56. Consequently, Congress has left it to the SEC and the courts to define the term. *Id.* A "classic" tender offer is "generally defined as a public invitation to a corporation's shareholders to purchase their stock for a specified consideration." *E.H.I. of Florida, Inc. v. Insurance Co. of North America*, 652 F.2d 310, 315 (3d Cir. 1981). If a securities transaction falls outside the parameters of this "classic" definition, courts have developed various tests to determine whether the transaction constitutes a tender offer. The three most common of these tests are: (1) the eight-factor test, *see, e.g., Hanson Trust*, 774 F.2d at 56–57; (2) the totality of the circumstances test, *see, e.g., id.* at 57; and (3) the public announcement/rapid acquisition test, *see, e.g., S–G Securities Co. v. Fugua Investment Co.*, 466 F.Supp. 1114, 1125 (D.Mass. 1978).

■ In the court's opinion, defendants' 51% offer falls within the "classic" definition of a tender offer: by sending Granet's January 28th letter to the press, which resulted in defendants' offer being widely published, defendants made a public invitation to ACI's stockholders to purchase 51% of the outstanding common stock of ACI for $15 per share. The fact that defendants couched their tender offer in conditional and "proposal" language does not take the offer out of the definition. *See id.* at 1126. Even if defendants' offer does not fall within the "classic" definition, it at least passes the "totality of the circumstances" test, which the court believes is

the most flexible and reasonable of the three tests listed above. As the *Hanson Trust* court stated:

[S]ince the purpose of § 14(d) is to protect the ill-informed solicitee, the question of whether a solicitation constitutes a "tender offer" within the meaning of § 14(d) turns on whether, viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.

*Hanson Trust*, 774 F.2d at 57. As recounted in the court's finding of facts, defendants' announcements of first an 80% and then a 51% tender offer for ACI stock had a profound effect on the market, and consequently on ACI's shareholders. Because defendants made no disclosures whatsoever, either through the required SEC filings or through the media, ACI's shareholders had absolutely no information, beyond the market's reactions, upon which to base a decision to retain or sell their shares. Although defendants did not exert any direct pressure on shareholders to sell by establishing a "cut-off" date for tendering shares, defendants exerted indirect pressure on shareholders by manipulating the market price upwards through their announcements of a tender offer. Public announcements like the ones made by defendants thus create the very dangers the Williams Act was intended to guard against. Accordingly, the application of sections 14(d) and 14(e) to the case at hand is entirely appropriate. *See, e.g., S–G Securities*, 466 F.Supp. at 1126.

If defendants had wanted to escape having their 51% offer be subject to section 14(d)'s requirements, they could have followed the dictates of Rule 14d–2(d), commonly referred to as the "Safe Harbor" rule for public announcements. Rule 14d–2(d) provides:

A public announcement by a bidder through a press release, newspaper advertisement or public statement which

only discloses [the following] ... shall not be deemed to constitute the commencement of a tender offer[:] ... (1) The identity of the bidder; (2) The identity of the subject company; and (3) A statement that the bidder intends to make a tender offer in the future ... which does not specify the amount of securities ... or the consideration to be offered....

17 C.F.R. § 240.14d–2(d). Instead, by sending Granet's January 28th letter to the press, which caused its contents to be first published in the *Journal of Commerce* on February 3, 1988, defendants announced the identity of the bidder, the identity of the target, the amount and class of securities being sought, and the price being offered, and placed themselves squarely within Rule 14d–2(b), which deems such an announcement to constitute the commencement of a tender offer under Rule 14d–2(a)(5). *Id.* § 240.14d–2(b).

■ Interestingly, defendants make no attempt to refute the merits of plaintiff's claims that defendants violated sections 14(d), 14(e), and 10(b). At the very least, defendants have violated the requirements of section 14(d) by not making the appropriate filings with the SEC. Additionally, given the price and volume fluctuations which followed on the heels of defendants' announcements of a tender offer, plaintiff has an excellent foundation for building a strong case against defendants for violations of the anti-fraud provisions. For these reasons and the reasons discussed above, we conclude that plaintiff has met the burden of proving a likelihood of success on the merits of the section 14(d) and 14(e) claims.

### Immediate Irreparable Injury

■ Plaintiff claims that defendants' violations of the securities laws have resulted in immediate injury which cannot be adequately remedied by an action for damages. Essentially, plaintiff claims that defendants' actions threaten plaintiff's continuing viability as a business. This threat has manifested itself in the following ways. First, defendants' actions have disrupted ACI's normal business operations. Although defendants did not comply with the securities laws, their noncompliance did not release plaintiff from the dictates of the Securities Exchange Act, which, among other things, requires that a target of a tender offer file a Schedule 14d–9 statement with the SEC, and publish its position with regards to the tender offer to its shareholders. *See* 17 C.F.R. § 240.14d–9. Consequently, ACI's management has had to divert its attention from its normal business operations to respond to defendants' tender offer, a response which was made more difficult by defendants' failure to comply with the relevant securities laws. This harm will continue if defendants are allowed to make or announce tender offers which not only violate the Williams Act, but which also are only questionably sincere. Courts have recognized the general disruption of a business as irreparable harm warranting a preliminary injunction remedy. *See, e.g., Boyertown Burial Casket Co. v. Amedco, Inc.,* 407 F.Supp. 811, 817 (E.D.Pa.1986); *Elco Corp. v. Microdot, Inc.,* 360 F.Supp. 741, 753 (D.Del.1973). While the court cannot at this time eliminate the disruption which naturally occurs as a result of a tender offer, the court can at least lessen a substantial portion of ACI's injuries by requiring the defendant to comply with the securities laws, a requirement which will serve to discourage insincere tender offers that cause ACI disruption only for the purpose of lining the offerors' pockets.

Second, the uncertainty created by the threatened tender offer has allegedly caused a deterioration in ACI employee morale and the resignation of several valuable employees. Third, this same uncertainty has caused ACI customers to lose confidence in the company and question their continuing association with ACI. As the *Elco* court stated: "such uncertainty in the world of business may be as devastating as accomplished unfavorable fact." *Elco,* 360 F.Supp. at 753. Again, the court cannot at this time remedy the alleged harm already done, but can attempt to lessen ACI's injuries by prohibiting defendants from making tender offers until they supply the informa-

tion required by law, which information is designed to relieve the uncertainty naturally caused by tender offers.

In response, defendants argue that disruption of the company is not an irreparable injury, that all tender offers opposed by management create some disruption, and that plaintiff compounded its alleged injuries by announcing its rejection of defendants' offer. We find these arguments unconvincing, especially in light of the potential continuing injuries awaiting ACI should defendants be allowed to follow their past path. In *Panter v. Marshall Field & Co.*, the court discussed a hypothetical situation which comes close to duplicating the facts of the present case. *Panter*, 646 F.2d at 286. The court stated that when an offeror announces a proposed tender offer which he never intends to make in order to dispose of securities of the target company at artificially inflated prices, such conduct is appropriately remedied by a preliminary injunction. *Id.* at 285–87. Without such a remedy, the injuries to a target company may never be compensated and the court would lose its best opportunity to do equity. *Id.* at 287; *see also Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250–51 (2d Cir.1973). Given the facts of the present case, we believe that plaintiff will indeed suffer irreparable injury if the defendants are allowed to continue making or announcing tender offers in violation of the securities laws.

### Balance of Harms

■ The balance of harms tips decidedly in the plaintiff's favor. The injuries discussed above will be continuing ones, as long as defendants are not enjoined from their activities. On the other hand, defendants suffer no harm whatsoever. The preliminary injunction only requires defendants to obey the law. Furthermore, if defendants are victorious at trial, they can renew their tender offer at a later date. *See, e.g., Sonesta*, 483 F.2d at 250.

Defendants argue that they will, in fact, be harmed if a preliminary injunction is granted. Defendants claim that an injunc-

tion would disrupt their plans and their financing, and would cause them to suffer duplicate costs. Frankly, we do not understand defendants' argument. Since defendants have expended no money in complying with the Williams Act, we fail to see how an injunction would cause them to suffer duplicate costs. Additionally, since defendants withdrew their tender offer, we cannot imagine how an injunction would disrupt their plans and financing. Because defendants have failed to produce any evidence of harm, the balance of harms tips toward plaintiff.

### Public Interest

■ As discussed previously, the Williams Act was enacted to protect public shareholders. By enjoining defendants from further violations of the Williams Act, the public interest is served by preventing uninformed securities transactions and by preventing further market manipulations.

The Second Circuit expressed it well:

If [the offeror] is in fact proceeding in violation of the ... securities laws, a preliminary injunction would serve the public interest as much as [the target company's] private interest. In this regard, by asserting these claims, [the target company] is assuming a dual role, including that of a private attorney general. Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service. As the Supreme Court said in *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), private actions provide 'a necessary supplement' to actions by the government and 'the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement' of laws designed to protect the public interest. Therefore, as in actions brought by the government, doubts as to whether an injunction

sought is necessary to safeguard the public interest—when the public interest involved is as clear, pervasive and vital as the record here demonstrates—should be resolved in favor of granting the injunction.

*Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.,* 476 F.2d 687, 698–99 (2d Cir.1973).

### Appropriate Injunctive Relief

 Although plaintiff has met its burden and proven its entitlement to injunctive relief, the question of *what* injunctive relief to grant still remains. Plaintiff seeks three injunctions; each will be discussed separately.

First, plaintiff requests that defendants be enjoined from making or announcing any tender offer for ACI stock unless prior to taking such action defendants make a "corrective" disclosure, make a rescission offer, and divest their ACI shares. Thus, plaintiff's first request is a conditional one. While the court sees no difficulty in granting plaintiff's injunction with its first condition, we are hesitant to order defendants' compliance with the second and third conditions.

As we have previously stated, ACI is requesting that defendants comply with the security laws relevant to tender offers. ACI does not want to enjoin all future tender offers for ACI stock that defendants might wish to make. Accordingly, ACI requests an injunction which prohibits the defendants from making or announcing another tender offer, unless and until they correct their past omission: *i.e.,* unless and until they file the required 14(d) disclosures with the SEC for their February 3rd tender offer. Additionally, because defendants have publicly withdrawn the February 3rd tender offer, ACI requests that defendants be required to comply with the requirements concerning withdrawal of a tender offer. *See* 17 C.F.R. §§ 240.14d–2(b), 240.-14d–100. Although it is somewhat anomalous to call this disclosure "corrective," since the defendants made no attempt to file a disclosure statement, we use the term to indicate that defendants must correct their failure to make a 14(d) disclosure for the past tender offer for ACI stock. Requiring "corrective" disclosures as a part of a preliminary injunction is not unusual. *See, e.g., Florida Commercial Banks,* 772 F.2d at 1519; *San Francisco Real Estate Investors v. Real Estate Investment Trust of America,* 701 F.2d 1000, 1009 (1st Cir. 1983); *Pacific Realty Trust,* 685 F.2d at 1085–86 (curative disclosure is the standard and preferred remedy for 14(d) violations). Thus, we find plaintiff's request for a corrective disclosure to be appropriate, and it will be granted.

On occasion, courts have gone beyond requiring a corrective disclosure to provide more deterrence to those offerors who purposely fail to file disclosure statements, or who purposely file false and misleading disclosure statements. The First Circuit adopted an SEC–suggested test for determining whether more than a corrective disclosure should be required:

> [W]hile taking care not to tip the balance between offeror and target sought to be achieved by the Williams Act, [a court should] consider (1) whether a substantial number of shares were purchased after the misleading disclosures and before corrective disclosure, (2) whether the curative disclosure occurred simultaneously with or on the even of a tender offer, and (3) whether the violation was egregious.

*San Francisco Real Estate,* 701 F.2d at 1009. We agree with the First Circuit that this is a sensible test. Nevertheless, there is not enough evidence before us from which we can make a determination if the test has been met. Accordingly, we hesitate to speculate and to require more than the corrective disclosure.

Moreover, plaintiff's request for rescission and divestment are not appropriate remedies at this time. As defendants point out, plaintiff essentially is requesting complete relief before a trial on the merits. Also, as we mentioned previously, these requests are not prohibitory, although they are appended as conditions to a prohibitory injunction. Rather, plaintiff's rescission and divestment requests require affirma-

tive acts by the defendants, thus raising these two conditions to the level of a mandatory injunction.[3] At the present time, the facts and the law do not so clearly favor plaintiff as to warrant ordering the defendants to make a rescission offer or to divest their ACI shares. Consequently, the court will not include these two conditions in plaintiff's first request for injunctive relief. The court cautions the defendants, however, that should they repeat their conduct, we would be inclined to require rescission and/or divestment.

In its second request, plaintiff asks the court to enjoin defendants from voting or in any other way exercising their rights as shareholders of ACI stock. Again, we do not have adequate facts from which to determine whether such an injunction is warranted. Defendants have yet to divulge the percentage of their ownership. Therefore, it is impossible to determine whether defendants have a substantial enough position to cause ACI injuries by exercising their shareholder rights. Furthermore, it is not clear whether defendants made purchases during the period of their illegal tender offer (*i.e.,* February 3—17, 1988). Without this information, we cannot enjoin defendants from exercising their voting or other shareholder rights. However, we reserve the right to amend our order should such information be forthcoming.

In its third request, plaintiff asks the court to enjoin defendants from making any future attempts to acquire or influence the control of ACI, either by means of a tender offer, merger, proxy contest or otherwise, without first complying with the Securities Act and the Securities Exchange Act. In essence, plaintiff seeks to enjoin defendants from further violations of the securities laws. We do not hesitate in granting this relief.

In *Hanson Trust,* the Second Circuit warned against improvidently granting preliminary injunctions:

Although we should not hesitate to enforce the Act's disclosure provisions through appropriate relief, we must also guard against improvident or precipitous use of remedies that may have the effect of favoring one side or the other in a takeover battle *when allegations of violation of the Act, often made in the heat of the contest, may not be substantiated.* In this context the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, ... must be used with great care, lest the forces of the free market place, which in the end should determine the merits of takeover disputes, are nullified.

*Hanson Trust,* 774 F.2d at 60 (emphasis added). We are confident that a preliminary injunction is the appropriate remedy in the case at hand. Defendants' alleged violations of the securities laws have been adequately substantiated to justify judicial refereeing of this takeover battle. Moreover, given defendants' conduct in this takeover attempt, as well as its similar activities in pursuit of U.S. Truck Lines, our granting this injunction serves more as an aid to the free market than as an interference with it.

IT IS THEREFORE ORDERED that defendants, jointly and severally, are preliminarily enjoined, directly or indirectly, through any director, officer, agent, partner, employee, representative or affiliate, from making or announcing any tender offer for American Carriers, Inc., or otherwise engaging in any acts in furtherance of a tender offer for stock of American Carriers, Inc., unless prior to taking any such action defendants make all filings with the Securities and Exchange Commission and publish, send or give to American Carriers, Inc., shareholders all information that defendants were required to provide under section 14(d) of the Securities Exchange Act of 1934 and the rules promulgated thereunder in connection with their February 3, 1988, tender offer for American Carriers, Inc., stock, and in connection with

---

**3.** The court recognizes that making defendants file corrective disclosures is also a form of mandatory injunction. On the facts, however, defendants have clearly violated the disclosure requirements of section 14(d). Thus, this "mandatory" portion of plaintiff's first injunction request meets the more stringent mandatory injunction requirement. *See supra,* p. 806.

their later withdrawal of their February 3rd tender offer.

IT IS FURTHER ORDERED that defendants, jointly and severally, are preliminarily enjoined, directly or indirectly, through any director, officer, agent, partner, employee, representative, or affiliate, from making any future attempts to acquire or influence the control of American Carriers, Inc., either by means of a tender offer, merger, proxy contest or otherwise, unless defendants first comply with all applicable requirements under the Securities Act of 1933 and the Securities Exchange Act of 1934.

IT IS FURTHER ORDERED that plaintiff post an additional $10,000.00 bond with the clerk of the court.