HILL'S PET NUTRITION, INC., Plaintiff,

v.

NUTRO PRODUCTS, INC., Defendant.

No. 03–4001–SAC.

United States District Court, D. Kansas.

March 25, 2003.

---

Bernard J. Rhodes, Lathrop & Gage L.C., Kansas City, MO, for Plaintiff.

Michael B. Hurd and Richard R. Johnson, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on plaintiff's motion for a preliminary injunction. An evidentiary hearing was held on March 11, 2003, at which both parties presented evidence, including expert witnesses.

In summary, plaintiff alleges that defendant has falsely advertised that its "Natural Choice" brand of dog food is the top selling brand of dog food in the United States, and seeks an order requiring defendant to immediately cease its false advertising, recall its advertisements, promotional materials, and packages which contain the alleged false advertising.[1] Specifically, plaintiff alleges that defendant's advertisements, promotional materials, and packages of products which bear a gold medallion "burst" stating "Natural Choice-#1 In America's Pet Stores," but do not expressly refer only to defendant's Natural Choice Lamb Meal & Rice Formula, are false and misleading, in violation of the Lanham Act and Kansas common law. Defendant denies that the alleged advertisement and representations are false or misleading.

Having reviewed the parties' pleadings and exhibits, and having heard the testimony, the court issues the following findings of fact and conclusions of law.

FINDINGS OF FACT

The parties are competitors in the specialty or premium dog food market. Both manufacture premium dog food and dis-

---

1. Plaintiff additionally asks for the court to order defendant to correct one statement in a press release on its web site, but the court finds this issue moot, as defendant corrected this matter the very day plaintiff first brought it to defendant's attention, and plaintiff makes no claim that any language currently on defendant's web site is false or misleading.

tribute their products to specialty stores which sell primarily, if not exclusively, pet supplies and accessories for household pets, rather than mass marketing these products to grocery, department, or other non-specialty stores.

Plaintiff is based in Topeka, Kansas, and produces the number one selling brand of premium dog food in the United States. That brand is Science Diet.

Defendant is a foreign corporation, and produces the number one selling Lamb Meal and Rice Formula premium dog food in the United States. That product is sold under Nutro's "Natural Choice" brand.

Defendant first became aware near the end of 2001 that its Lamb Meal and Rice Formula was the number one selling product among specialty stores' dog food products from a Roper Audits and Survey Worldwide (ASW) report. The parties agree that this survey is generally accepted as reliable in their industry.

The Roper ASW survey showed that defendant's Lamb Meal and Rice Formula product was the number one seller among lamb and rice products and the number one product sold in any category description for the second quarter of 2002, whether measured by pounds sold, or by monetary sales volume.

Based upon the information in the Roper ASW survey, defendant began an advertising campaign capitalizing upon its status as number one.

In January of 2002, defendant added to its Lamb Meal and Rice formula packages the statement, "America's # 1 selling Lamb Meal & Rice Formula dog food." This verbiage is in comparatively small font and appears directly underneath the brand logo, which states in much larger letters, "Nutro Natural Choice." *See*

Plaintiff's Exh. 5, 8, 11. Plaintiff does not allege that this statement is false or misleading, or that this form of advertising is otherwise illegal. Plaintiff admits this statement is true.

In September of 2002, defendant began applying a sticker to its 44 pound bags of Lamb Meal and Rice Formula dog food, which was gold or yellow in color, in the shape of a sunburst, which contained a large # 1. *See* plaintiff's Exh. 14. The words within the burst, when read in conjunction with the # 1 symbol, read, "NATURAL CHOICE, # 1 IN AMERICA'S PET STORES." [2] Plaintiff alleges that this statement is false or misleading.

Soon thereafter, defendant began producing Lamb Meal and Rice Formula dog food in packages which had the # 1 burst printed on them. *See* plaintiff's Exh. 6, 9, 12. Defendant never used the # 1 burst on packages other than its Lamb Meal and Rice Formula dog food packages.

Also in September of 2002, defendant began using the # 1 burst in its "point of purchase" materials. Point of purchase or point of sale materials are advertising materials sent by a manufacturer to stores which sell its products, with instructions that the materials be placed on or near certain products in a store, for the purpose of influencing consumer's decisions at the time of purchase. Although store employees could place point of purchase materials somewhere other than on or near the product advertised by those materials, this would defeat the purpose of the materials and would, in many cases make no sense, as the materials offer sales, bonuses, or other promotional offers relating solely to the specific product mentioned therein. *See e.g.,* plaintiff's exhs. 1B, 1C, 1D, 1F.

---

**2.** For ease of reference, the court will refer to this as the *"# 1 burst."* The court invites the reader to view the photographs of the burst, and notes that the phrase *"# 1"* is encircled by the other language and does not follow any particular word.

On September 5, 2002, defendant did a bulk mailing which contained the #1 burst. *See* plaintiff's exh. 1N.

On some undisclosed date thereafter, plaintiff learned of defendant's use of the verbiage, "#1 Selling Dog Food in America's Pet Stores," and by letter dated November 11, 2002, first complained to defendant about it. *See* plaintiff's exh. 1I, and attachments. Plaintiff thereafter learned of defendant's use of the #1 burst, and, after receipt of defendant's response to their initial letter, complained to defendant about that as well. *See* plaintiff's exhs. 1J, 1L.

After receiving plaintiff's first letter, defendant decided to change its point of purchase material. Accordingly, defendant reprinted approximately 10,000 tee-shirts which it awards as prizes to persons who demonstrate its products in the stores, to cover the #1 burst with a new burst. It also recalled final art which was already at the printers, redesigning the advertising materials before they were printed and released, to cover or omit the #1 burst. It distributed no point of purchase materials after November of 2002 which contained the #1 burst.

After November of 2002, defendant has used a new burst in lieu of the #1 burst on all its point of sale materials. The new burst states within the burst itself, "NATURAL CHOICE LAMB & RICE #1 IN AMERICA'S PET STORES." [3] *See* plaintiff's exhs. 10, 13.

Defendant continued to use the #1 burst on its packaging for a short time after it received plaintiff's first letter in November of 2002, as it believed that consumers would not reasonably be confused by statements made on the very product about which the statements were made,

*i.e.,* Lamb Meal and Rice Formula dog food. After receiving plaintiff's second letter, defendant changed its statements on its dog food packages as well, not because it believed its #1 burst was false or misleading, but because it wished to avoid litigation. Thus beginning in December of 2002, defendant began using the new burst on its packaging, in lieu of the #1 burst.

Defendant has agreed to use the new burst on its future packaging and point of purchase materials. Although the design thereof may change, defendant will use the same words or their equivalent in its advertising. Plaintiff admits that the language in the new burst is true.

Defendant has an existing inventory of packages with the #1 burst printed on them. Approximately 2,500 20–pound bags already manufactured are filled, palletized, and shrink-wrapped in inventory in Tennessee, still awaiting shipment. Another unknown quantity of smaller, 2–pound trial-size bags not manufactured by defendant are also palletized and paperbaled in inventory in California and Tennessee. These products all have a shipment date of March 27, 2003.

An unknown quantity of defendant's packages of dog food shipped before November of 2002, which bears the #1 burst, remains unsold in stores. Defendant's products have a 'sell by date' or shelf life of 14 months after the date of manufacture. No Natural Choice products age to their expiration date, and its 40 pound bags are routinely sold within 120 days. The trial-size bags, which are recommended to consumers by groomers, take longer to sell than the larger bags.

It is possible for defendant to create a sticker, at an approximate cost of ½ cent

---

**3.** Again, the court invites the reader to view the exhibits, showing the actual placement of the phrase "#1," surrounded by the remaining words, such that the #1 is not placed after any particular word.

each, and place it over the # 1 burst on bags in stores and in inventory. To do so would require defendant to use its store demonstrators for that purpose instead of for the purpose for which they were hired, and to pay for the labor involved in unpacking and repacking those packages in inventory which await shipment. Applying the stickers would take a period of time to accomplish, as defendant's demonstrators visit only approximately 2,000 out of 10,700 stores each week, and thus are not in every store every month.

The price paid per bag of premium dog food is nearly double that of dog food which is mass marketed. Consumers who purchase premium dog food are believed to be more affluent, better read, and more willing to spend money caring for their pets, than their mass market counterparts. Because the premium product is expensive, consumers seek confidence in their purchasing decisions, so rely upon advice from friends, veterinarians, breeders, or other pet professionals, and what they read.

Plaintiff's primary focus in marketing for the specialty market, rather than for the mass market, is upon a 'switcher,' i.e., a person who is not 80% to 100% brand loyal. Although some consumers switch from one brand to another within the specialty dog food market, plaintiff's advertising efforts are intended to influence consumers to switch from mass market products to the specialty dog food market.

A brand is a trusted symbol upon which consumers rely to guide their purchasing decisions. Brand equity is the value of the brand, trust, and consumer confidence— the premium price a manufacturer can demand because of meeting consumer expectations in an ethical way.

The # 1 burst used by defendant is one form of assurance which consumers may rely upon in making a decision to purchase the product. One message conveyed by the

# 1 burst is that the consumer should "trust us because everyone else does."

Plaintiff believes that the # 1 burst is false or misleading because it conveys to potential purchasers that Nutro's Natural Choice is the # 1 brand of dog food in the United States.

Plaintiff retained Mr. Walter McCullough for the purpose of conducting a consumer survey to determine whether the # 1 burst and defendant's Lamb Meal and Rice Formula dog food package is misleading. Mr. McCullough is President and C.E.O. of Monroe Mendelsohn Research, Inc., an independent consumer research agency in New York, New York.

Mr. McCullough's report, Plaintiff's exh. 2, indicates that while conducting the survey, he utilized the front panel of the 5 pound package of defendant's Lamb Meal and Rice Formula. He admitted at the hearing that he actually just showed consumers a photograph of the front panel of that package in conducting his survey.

To conduct the survey, Mr. McCullough hired individuals to conduct "mall intercept" interviewing, where persons walking in a shopping mall are stopped, screened for age and sex in percentage to the general population, and asked certain qualifying questions. The screening questions were intended to screen out persons such as mall employees or those having special knowledge of the topic, in an effort to get typical consumers who own dogs and feed them dry dog food.

Persons who passed the screening and agreed to be interviewed were then taken to another location where they were shown an 8½" by 11" photograph of the 5-pound package, bearing the # 1 burst. The photograph was then removed, and the interviewees were asked the following open-ended questions: 1. "What is the main idea that the information on this package com-

municates to you?" 2. "What other ideas, if any, does this package communicate to you?" The interviewer was instructed to keep asking, "Anything else?" until the respondent indicated there was nothing else.

Respondents were then handed the photograph again and were told by the interviewer, "I'd like you to look at this photo again, paying particular attention to the circular seal and the sentence immediately below the "Natural Choice" brand name." The sentence immediately below the "Natural Choice" brand name stated: "America's #1 selling Lamb Meal & Rice Formula dog food."

The photo was again removed, and respondents were asked, "What, if anything, did the information you just looked at communicate to you about being number one?" Interviewers were to follow up by continuing to ask, "Anything else?" until the respondent replied negatively.

The final question, "Question 6," was the sole one asked which was closed-ended, *i.e.,* it offered a fixed number of choices. This question, and the responses thereto compiled by Mr. McCullough, are set forth below:

- Of all brands of dog food, the Natural Choice brand is the number one selling brand ........................ 37%
- Of all varieties of dog food, the Natural Choice Lamb Meal and Rice formula is the number one selling variety .......... 27%
- Of all lamb meal and rice formula dog foods, the Natural Choice Lamb Meal and Rice Formula is the number one selling lamb meal and rice formula........................ 46%
- None of the above ........................ 8%
- Don't know ........................ 1%

Respondents were informed that they could select more than one of the statements above. Although some persons responded "none of the above" or "don't know," the interviewers were instructed not to record those responses if that respondent also selected any of the first three options.

Based upon his survey, Mr. McCullough believes that the package using the #1 burst communicates to 37% of dog food purchasers the false message that the Natural Choice brand, not just the Natural Choice Lamb Meal and Rice Formula, is the #1 brand of dog food.

Defendant's expert, Dr. Jacob Jacoby, offered his opinion that Mr. McCullough's conclusions are not scientifically valid, and lack sufficient foundation. Dr. Jacoby's critique was based primarily upon the following reasons:

- Mr. McCullough used a photograph instead of the actual product despite the ease of transporting the 5 pound bag. This was done in derogation of the general rule that one uses the original, real world stimulus where possible, to enable the consumer to handle the product as they would under normal conditions, and to permit them to view all the information on the package.
- Mr. McCullough failed to use a control group. Dr. Jacoby considers a control group necessary whenever a survey is conducted to determine the cause of a particular mental state, as here, rather than just the mere existence of that mental state. A control group would have determined whether the meaning extracted by the respondents after viewing the package was in fact due to their having viewed the message on the package, instead of being due to "noise" or prior exposure to the package, other experiences, misunder-

standings, or other non-package factors.

- Some questions on the survey used leading language, and thus suggested to the respondent that a particular choice was expected. Particularly, Question 6, the sole closed-ended question, failed to include the phrase "if any," although the open-ended questions used that phrase. Question 6 thus suggested that one of the stated choices was correct.
- Respondents were permitted to select more than one statement in response to Question 6, lessening the accuracy of the results.
- Respondents who responded "none of the above," or "don't know" should have been included in the tabulated results, regardless of whether they also selected another response, for greater accuracy.
- Question 6 failed to include options other than brand, variety, and formula, such as that the statement of #1 was mere puffery.

Dr. Jacoby offered no opinion as to whether or not defendant's #1 burst was or was not deceptive, and solely offered reasons why Mr. McCullough's survey is unreliable.

Dr. Jacoby additionally stated that even assuming Mr. McCullough's survey was valid in showing that consumers are deceived as stated, it does not purport to show that the #1 burst is the cause of the deception. Instead, the survey results are confounded. Prior to answering Question 6, respondents were verbally, and by means of the interviewer's gestures, directed to two statements. One statement, i.e., "America's #1 selling Lamb Meal & Rice Formula dog food," is, as plaintiff admits, true and not objectionable. The other statement, the #1 burst, is allegedly false or misleading. Because the survey made no attempt to distinguish whether the true statement or the allegedly false statement caused the respondent's opinion, the survey is useless to show the cause of any deception.

Dr. Jacoby additionally found it significant that the percentage of consumers (37%) who responded that they understood that Natural Choice was the number one selling brand is no different than the number of persons who would have selected that option as a result of random chance. Because respondents were permitted to select more than one statement, the total percentage of substantive responses is not 100%, but 110% (37% + 27% + 46% = 110%.) Divide that total by the number of substantive responses offered, and the product is 36.66% (110 divided by 3 = 36.666). Because no control group was used, the possibility that the results for Question 6 were because of mere chance cannot be ignored.

## CONCLUSIONS OF LAW

The court has subject matter jurisdiction based on federal question, 28 U.S.C. § 1331, and supplemental jurisdiction over the Kansas common law claim.

■■■ A preliminary injunction is an extraordinary remedy which is granted as the exception rather than the rule. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). The grant or denial of a preliminary injunction rests within the sound discretion of the trial court. *Tri–State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 354 (10th Cir.1986); *Amoco Oil Co. v. Rainbow Snow,* 748 F.2d 556, 557 (10th Cir.1984). The primary purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits in order that the trial court can then render a meaningful decision. *Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1198 (10th Cir.1992).

■ The movant has the burden to establish by clear and unequivocal proof its right to a preliminary injunction. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir.1975). Mere allegations are not sufficient. *Kansas City, Kan. Fraternal Order of Police, Lodge No. 4. v. City of Kansas City, Kansas*, 620 F.Supp. 752, 768 (D.Kan.1984).

■ Certain types of preliminary injunctions are disfavored. They include: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991). For one of these disfavored preliminary injunctions to issue, the movant must carry the heavier burden of showing that the following four factors "weigh heavily and compellingly in the movant's favor." *Id.* at 1098. "[M]andatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party." *American Carriers, Inc. v. Baytree Investors, Inc.*, 685 F.Supp. 800, 806 (D.Kan.1988) (citations omitted).

■ In this case, plaintiff bears the heavy burden of showing that the following four factors for a preliminary injunction weigh heavily in its favor:

(1) it will suffer irreparable injury unless the temporary relief issues; (2) the threatened injury to the movant outweighs whatever damage the temporary relief may cause the opposing party; (3) the temporary relief would not be adverse to the public interest; and (4) there is a substantial likelihood that the movant will eventually prevail on the merits.

*City of Chanute v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 313 (10th Cir. 1985).

■ A movant's burden is particularly heavy when the injunctive relief sought would in effect grant the movant a substantial part of the relief the plaintiff would recover upon a trial of the merits. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir.1991) (such injunctive relief "is similar to the 'Sentence first—Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence").

*McCormick v. Farrar*, 2001 WL 1456796, *2 (D.Kan.2001). **Irreparable Harm**

**General law**

■ A harm is irreparable if money damages are an inadequate remedy because of difficulty or uncertainty in their proof or calculation. *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir.1990). "[L]oss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F.Supp. 1172, 1181 (D.Kan.1988); *see Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F.Supp.2d 1102, 1108 (D.Kan.2000) (irreparable harm due to "extreme difficulty and uncertainty in restoring goodwill among customers and regaining the business of customers"). *See Flying Cross Check, L.L.C. v. Central Hockey League, Inc.*, 153 F.Supp.2d 1253, 1259 (D.Kan.2001).

■ "Perhaps the most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be granted." *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2nd Cir.1985). A speculative injury or the mere possibility of harm will not suffice. *Public Service Co. of New Hampshire v. Town of West Newbury*, 835 F.2d 380, 383 (1st Cir.1987).

On the other hand, the movant need not establish an actual injury or the certainty of an injury occurring; it is enough to show " 'a strong threat of irreparable injury before trial.' " *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir.1990) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948 at 437–38 (1973)).

**Lanham Act Cases**

Plaintiff contends that irreparable harm is presumed in Lanham Act cases if a reasonable likelihood of success on the merits is shown. Plaintiff relies upon the well-established presumption in other circuits that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss. *See, e.g., Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992); *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988). This presumption is based upon the rationale that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations. *Abbott Laboratories*, 971 F.2d at 16.

The Tenth Circuit has limited this presumption to the following circumstances:

> In any event, the presumption is properly limited to circumstances in which injury would indeed likely flow from the defendant's objectionable statements, *i.e.*, when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product. *See Ortho*, 32 F.3d at 694; *Porous*, 110 F.3d at 1335.

*Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir.2000); *See Western Chemical Pumps, Inc. v. Superior Mfg., Inc.*, 989

F.Supp. 1112, 1130 (D.Kan.1997) (holding that irreparable harm may be presumed if the challenged advertisement directly, but falsely, proclaims the superiority of defendant's product over plaintiff's product.)

Here, defendant's #1 burst does not refer directly to plaintiff, thus defendant has not explicitly compared its product to the plaintiff's. No evidence was elicited that plaintiff's products and defendant's products routinely appear in close proximity to each other in stores. Although defendant and plaintiff are competitors in the specialty dog food market, plaintiff has failed to show that it and defendant are "obvious competitors" with respect to the lamb and rice meal product at issue,[4] such that harm should be presumed. *Compare Hutchinson*, 211 F.3d at 522; *Warner–Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 94 (3d Cir.2000) (courts presume irreparable injury in a false advertising claim if the advertisements are necessarily impliedly aimed at plaintiff's product).

Accordingly, plaintiff is not entitled to any presumption of irreparable harm in this case. Apparently in reliance upon this presumption, plaintiff failed to present evidence of irreparable harm at the hearing. No evidence of record shows the court that plaintiff suffered any intangible harm, such as damage to reputation or loss of goodwill, or tangible harms, such as business loss, allegedly caused by defendant's acts. Instead, it appears than any damage to plaintiff could be remedied by mere money damages. Accordingly, the court finds that plaintiff has failed to meet its burden to show irreparable harm.

Although an order denying plaintiff's motion would be sufficient if based solely upon this reason, the court relies upon the following reasons as well.

---

4. The court understands but rejects, for reasons detailed later in this memorandum, plaintiff's theory that the #1 burst directly refers to plaintiff's brand, and necessarily impliedly aims the advertisements at plaintiff.

**Balance of Harm**

Plaintiff next must show that the threatened injury to it outweighs whatever damage the temporary relief may cause the defendant. Plaintiff contends this factor is met because it is not asking defendant to cease selling its competing product, but only to spend money to correct the false advertising and to monitor the recall of previously distributed packages and advertising materials, a harm which defendant brought about itself. *See Novartis Consumer Health v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596 (3d Cir.2002).

Defendant counters that it would be costly and burdensome to do so, as it has sold millions of pounds of the challenged product per year and would likely be required to recall many million pounds from retailers. Defendant contends that there is no threatened injury to plaintiff in the absence of an injunction, because plaintiff can be made whole by monetary damages in the event a violation of law is found.

Plaintiff has not shown the court what the threatened injury is to it from defendant's allegedly false advertising. The closest it came was through the testimony of Mr. John Munchoff, the Director of Consumer Marketing for Science Diet in the United States for plaintiff. He stated that the # 1 burst's message, of "trust us because everyone else does," hurts plaintiff "because it's not true." This circuitous statement means no more than the false statement hurts plaintiff because it is false.

The survey did not purport to show any relation between the falsity, if any, of defendant's advertising, and any decision to purchase by any consumer. No questions were asked about whether the # 1 burst would make the consumer more or less likely to buy that product or any of defendant's products, instead of plaintiff's products. For this court to assume that plaintiff has suffered or will suffer any injury whatsoever from the # 1 burst would be mere speculation.

Defendant did show the court that temporary relief, in the form of manufacturing and applying stickers to its existing inventory and products already on store shelves, would be labor intensive. Additionally, although the stickers cost only approximately ½ cent each, defendant testified that there may be hundreds of thousands of bags on store shelves, an undetermined number of which would need stickers. Thus such an effort could be expensive.

The balance of harms weighs equal. Plaintiff has not met its burden to show that the threatened injury to it outweighs whatever damage the temporary relief may cause the defendant.

**Public Interest**

The third factor plaintiff must show is that the temporary relief would not be adverse to the public interest. Here, the relief sought is an order requiring defendant to immediately cease its false advertising, and to recall its advertisements, promotional materials, and packages which contain the allegedly false advertising.

Although the public interest does not weigh heavily in this case, the public interest in true and accurate advertising would support issuance of the injunction, if defendant's advertising and promotional materials are likely false. Defendant has met its burden to show that the temporary relief proposed would not be adverse to the public interest.

**Substantial and Doubtful Questions on the Merits**

To satisfy the fourth element, the movant must present " 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.' " *Autoskill, Inc. v. National Educational Support Systems, Inc.*, 994 F.2d

1476, 1487 (10th Cir.) (quoting *Continental Oil Co. v. Frontier Refining. Co.*, 338 F.2d 780, 781 (10th Cir.1964)), *cert. denied,* 510 U.S. 916, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993). This is not to say that the movant must show "to an absolute certainty that it" will prevail. *Id.* Instead, this element is liberally defined: " 'when the other three requirements for a preliminary injunction are satisfied, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.' " *City of Chanute,* 754 F.2d at 314 (quoting *Otero Savings and Loan Association v. Federal Reserve Bank,* 665 F.2d 275, 278 (10th Cir.1981)).

**Lanham Act Claim**

Section 43(a) of the Lanham Act as amended reads, in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any

person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■■■ The Tenth Circuit has held that in order to succeed on a false advertising claim under § 43(a) of the Lanham Act, the plaintiff must demonstrate:

(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

*Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 980 (10th Cir.2002), citing *Cottrell, Ltd. v. Biotrol Int'l, Inc.,* 191 F.3d 1248, 1252 (10th Cir.1999).[5]

**1. Material false representations**

**a. Literal Falsity**

■■■ In the false advertising arena, some courts have concluded that a showing that the challenged statement is likely to be found literally false is sufficient, on its own, to justify issuing the injunction. *Gillette Co. v. Norelco Consumer Prods. Co.,* 946 F.Supp. 115, 120 (D.Mass.1996). *See also Camel Hair and Cashmere Inst. of America, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 15–16 (1st Cir.1986)(holding that "literally false" finding "in itself warranted the grant of the injunction sought."); *Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.,* 198 F.Supp.2d 59, 65 (D.Mass.2002).

Plaintiff contends that defendant's representations are literally false, because

---

5. Because plaintiff has not offered any independent arguments or analysis under state law, the court's analysis of its motion for injunctive relief is confined to the Lanham Act.

they say "Natural Choice—# 1 in America's Pet Stores," but defendant's brand of pet food products is not # 1 in America's Pet Stores. Rather, Hill's Science Diet brand of pet foods is the overall top selling brand of pet foods in America's pet stores.

Defendant alleges that the representation above is not literally false, and that the packaging bearing that phrase appears only on packages of defendant's Lamb and Rice product, which both parties admit is the # 1 selling product in America's pet stores.

"In order to assess whether an advertisement is literally false, the Court must analyze the message conveyed within the full context of the advertisement." *Utah Medical Products, Inc. v. Clinical Innovations Associates, Inc.,* 79 F.Supp.2d 1290, 1309 (D.Utah 1999). Thus "text must yield to context." *Avis Rent A Car System, Inc. v. Hertz Corp.,* 782 F.2d 381, 385 (2d Cir.1986). "A determination of literal falsity entails an analysis of the message in context." *Johnson and Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals Co.,* 1993 WL 21239 (E.D.Pa.1993), *aff'd,* 19 F.3d 125, 134 (3d Cir.1994).

Defendant additionally contends that the packaging cannot be literally false because the statement is at least ambiguous, and "ambiguity precludes a finding of literal falsity." *In re Century 21–RE/MAX Real Estate Advertising Claims Litigation,* 882 F.Supp. 915, 923 (C.D.Cal.1994). "Only an unambiguous message can be literally false." *Novartis Consumer Health,* 290 F.3d at 587.

The court finds that defendant's # 1 burst is not literally false because it does not say "Natural Choice—# 1 **brand** in America's Pet Stores, and is at the very worst, ambiguous." The statement "Natural Choice—# 1 in America's Pet Stores," could mean that Natural Choice brand is the # 1 brand in America's pet stores, (as

plaintiff contends, and would thus be a false claim), or could mean that Natural Choice's lamb meal and rice formula is the # 1 selling lamb and rice dog food (as defendant contends, and would thus be a true claim.) Accordingly, if plaintiff is entitled to an injunction, it must be based on implied falsity, rather than literal falsity.

**b. Implied Falsity**

The Lanham Act encompasses implied falsehoods as well as literal ones. As the Tenth Circuit has stated:

> ... "Section 43(a) of the Lanham Act encompasses more than literal falsehoods," because otherwise, "clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed." *American Home Prods. Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir. 1978). To assess the truth or falsity of these latter, more amorphous, misleading statements, "the courts favor testing by consumer reaction surveys, but have also found falsity based on their own independent reaction and the reaction of witnesses testifying before the court, including testimony based on test results, consumer surveys, complaints received, allegations of more than a few instances of misrepresentation, and otherwise." McKenney & Long, supra, § 6.03[2], at 6–27 to 6–28 (citing cases) (footnotes omitted).

*Cottrell, Ltd.,* 191 F.3d at 1252. *See White Welding and Mfg. Inc. v. Keystone Industries, Inc.,* 1996 WL 502089, *2 (D.Kan.1996); *Braintree Laboratories, Inc. v. Nephro–Tech, Inc.,* 1997 WL 94237 (D.Kan. Feb. 26, 1997).

To prove implied falsity, plaintiff relies upon the results of McCullough's consumer survey, which he interpreted to show

that 37% of those surveyed believed that the packaging with the #1 burst meant that "of all brands of dog food, the Natural Choice brand is the number one selling brand." This number, plaintiff contends, is sufficient to show that a substantial portion of consumers is deceived. *See Novartis Consumer Health*, 290 F.3d at 594 (stating that a 15.5% figure would be sufficient to demonstrate a likelihood of substantial consumer confusion); *Johnson & Johnson–Merck*, 19 F.3d at 134 (citing case reflecting that a "deception rate" of 20% is generally sufficient to establish a substantial number of consumers who are misled.)

Defendant contends that plaintiff's survey evidence is irrelevant, as survey research should not be used to determine the meaning of words. *See Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883, 886 (7th Cir.2000) (finding the meaning of language is not a question of fact, to be determined by survey evidence, and that a "misunderstood" statement is not the same as one designed to mislead.) The court declines to rely upon this approach.

Defendant next contends that plaintiff's survey was obtained by "questionable techniques" of a disreputable expert, *i.e.,* Mr. McCullough. Defendant states that Mr McCullough's techniques were recently, thoroughly, and properly criticized in *Pharmacia Corp. v. Alcon Laboratories, Inc.,* 201 F.Supp.2d 335 (D.N.J.2002), among other cases, and should receive similar treatment here. Defendant urges the court to discount or disregard the survey because it is plagued by deficiencies similar to those found in *Pharmacia Corp.,* specifically, Mr. McCullough's methodology and execution of surveys. The court has reviewed *Pharmacia Corp.,* but finds the facts therein sufficiently distinguishable from the present survey as not to be persuasive.

■■■ Defendant next alleges that plaintiff's survey lacks scientific reliability, thus raising a *Daubert* challenge under Fed. R.Evid. 702. In support of its claim of lack of scientific reliability, defendant submits the testimony of Jacob Jacoby, Ph.D. As noted in the court's findings of fact, Dr. Jacoby's opinion includes that defendant's survey was conducted without appropriate controls, used a biased and misleading key question, and obtained a result (37%) which is no different than what would be expected by pure chance.

Defendant asks the court to discount the survey, and thus find that plaintiff has failed to prove that defendant's advertising is implicitly false. *See American Home Products Corp. v. Procter & Gamble Co.,* 871 F.Supp. 739 (D.N.J.1994) (unreliable consumer surveys failed to show that advertising was implicitly false).

The court finds the credentials and testimony of Dr. Jacoby to be impeccable, and his rationale thoroughly persuasive. Dr. Jacoby's critiques of Mr. McCullough's techniques and survey, as set forth above in the court's findings of fact, convince the court that Mr. McCullough's conclusions lack scientific validity. Plaintiff, having rested its case upon an invalid survey, has thus failed to prove that defendant's advertising is impliedly false.

The court finds not only that plaintiff has failed to show that the #1 burst is literally or impliedly false, but also that plaintiff has failed to show that the new burst is misleading.[6]

---

6. The parties have focused their arguments on the #1 burst. The court is uncertain whether plaintiff currently disputes defendant's use of the new burst, given plaintiff's admission that the language in the new burst is true, so makes the above finding in an abundance of caution.

### c. Materiality

In the event plaintiff proves falsity, it must additionally prove the materiality of the false representations. Plaintiff contends that the advertisements are material because they are "clearly" and "obviously" likely to influence the purchasing decision of consumers. Plaintiff argues that because consumers are deceived into believing defendant's false claim of superiority, the false statement is likely to make a difference to them in deciding which dog food to buy.

The court agrees with defendant's contention that plaintiff has offered no proof that defendant's misrepresentation is material in that it is likely to influence any purchasing decision. The survey, at best, shows deception, but does not attempt to show that the allegedly false statement of plaintiff would make a difference to the consumers in their decision to purchase dog food. *See Utah Medical Products, Inc. v. Clinical Innovations Assoc. Inc.*, 79 F.Supp.2d 1290, 1310 (D.Utah 1999).

### • Commerce requirement

Defendant in this case does not dispute the assertion that its challenged representations are commercial advertising and promotion in commerce. There is little doubt that its representations are properly categorized as such. *See White Welding and Mfg. Inc. v. Keystone Industries, Inc.*, 1996 WL 502089, *2 (D.Kan.1996). This element is thus met.

### 2. Likelihood of confusion

A plaintiff seeking relief for a Section 43(a) false advertising claim based on an implied falsehood must set forth some evidence of actual consumer confusion resulting from the falsehood. *See SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co., Inc.*, 906 F.Supp. 178, 181 (S.D.N.Y.1995). Consumer surveys are normally used to satisfy this additional requirement. *See Herbko International, Inc. v. Gemmy Industries Corp.*, 916 F.Supp. 322, 330 (S.D.N.Y.1996) (quoting *SmithKline*, 906 F.Supp. at 181).

The court finds that plaintiff's survey is insufficient to show actual consumer confusion. This is not only because of the lack of scientific validity of the survey, but also because of the survey, even if valid, does not speak to any causal connection. The survey fails to distinguish whether the 37% who believed the #1 burst meant #1 brand understood such from having misunderstood a true statement, from having understood the allegedly false statement, or from some other cause. In short, the survey fails to accomplish its intended purpose.

### 3. Injury requirement

The last element in this Lanham Act claim is that plaintiff has the burden to prove that it has been or is likely to be injured as a result of the advertisement. *See Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 244 (9th Cir.1990). Subjective belief of future damages is insufficient. *Walt Disney Productions v. Filmation Associates*, 628 F.Supp. 871, 880 (C.D.Cal.1986). The likelihood of injury is not presumed, but must be demonstrated. *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980).

Plaintiff alleges that it has shown a reasonable likelihood of injury on its damages claim by the consumer survey that establishes a 37% deception rate. Plaintiff bases this conclusion upon the law that a plaintiff "must establish customer reliance but need not quantify loss of sales as that goes to the measure of damages." *BreathAsure*, 204 F.3d at 92. Plaintiff further contends no proof of injury is necessary on

its claim for injunctive relief. *Id.; Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 210 (9th Cir.1989).

Defendant counters that plaintiff has not shown any evidence that it is likely to lose sales as a result of anything defendant has done, contending that the survey, even if reliable and admissible, may be sufficient to show some consumer confusion, but is insufficient to show any connection between any confusion and their decisions to purchase, or plaintiff's sales position.

Plaintiff, having made no attempt to translate the survey's deception rate into purchasing decisions or loss of sales, fails to meet this element, for reasons stated above.

**Conclusion**

"To ensure vigorous competition and to protect legitimate commercial speech, courts ... should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion." *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.,* 93 F.3d 511, 515 (8th Cir.1996). Plaintiff has failed to show any intent to deceive by defendant, and defendant has demonstrated good faith in changing its advertising to address plaintiff's concerns.

At this point, no judicial interference in the marketplace is warranted. Plaintiff will have an opportunity to prove its case on the merits, but has not met its burden at this stage, and therefore is not entitled to the extraordinary remedy of preliminary injunctive relief.

IT IS THEREFORE ORDERED that plaintiff's motion for a preliminary injunction is denied.